UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald PODOLSKY,
Defendant-Appellant.

No. 85–3239.

United States Court of Appeals,
Seventh Circuit.

Argued May 9, 1986.

Decided July 31, 1986.

Brent D. Stratton, Patrick A. Tuite, Ltd., Chicago, Ill., for defendant-appellant.

Suzanne B. Conlon, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

Podolsky, a Chicago fireman, was convicted after a bench trial of one count of violating 18 U.S.C. § 844(i), which makes it a federal felony to attempt to damage or destroy, by means of fire, any building used in interstate commerce, and one count of conspiring (in violation of 18 U.S.C. § 371, the federal conspiracy statute) to violate section 844(i). He was sentenced to four years in prison on the conspiracy count and to five years of probation and 500 hours of community service on the attempted-arson count. 625 F.Supp. 188 (N.D.Ill.1985). His appeal presents two issues: whether the agreement to burn down the building in question was conditional on an event that never took place, and whether, if not, still his conviction should be set aside because the government "manufactured" federal jurisdiction.

Ziedman, a paid informant for the federal Bureau of Alcohol, Tobacco and Firearms, hired Podolsky (who in turn hired Hawkins)

* Hon. William J. Campbell, of the Northern District of Illinois, sitting by designation.

to burn down the building located at 2436 West Division Street (Chicago), for $5,000. The building was vacant. This was important because Podolsky had made clear that he would not knowingly set fire to a building that had people in it; he didn't want to kill anybody. Before Podolsky could get to work on 2436, Ziedman asked him to burn down number 2438. Apparently the Bureau was concerned that there might not be federal jurisdiction over arson in the vacant 2436. But since 2438 was not vacant, Podolsky's concern that there might be people in it when he set fire to it intensified and he demanded assurances that everyone would be out before he did the job. Ziedman gave him the requisite assurances, whereupon Podolsky and Hawkins went one night to 2438, well equipped with flammable materials. But upon arrival they saw a light in one of the windows. Afraid that someone might be inside, they decided not to go through with the job. Instead they went over to 2436, to burn it—for their agreement to do so had not been superseded by their agreement to burn 2438—where they were immediately pounced on by waiting agents.

■ Podolsky was convicted of conspiracy to burn down 2438, not 2436 (because of jurisdictional concerns); and he argues that there was no such conspiracy because his agreement to burn down 2438 was conditional on its being emptied of people, a condition apparently not fulfilled. But a conspiracy may be actionable, even though it is conditional. *United States v. Anello*, 765 F.2d 253, 262 (1st Cir.1985). Every conspiracy is conditional to some extent, for no one agrees to go through with an agreement no matter what. Conditions, express or implied, do not make a contract unenforceable; they merely define the circumstances in which a party can avoid having to perform his contractual obligation; they presuppose rather than nullify the obligation. See Farnsworth, Contracts 536 (1982). Since criminal agreements are not enforceable, it would hardly make sense to import the law of contracts wholesale into the criminal law of conspiracy; we mention

contract law only to make clear that "conditional agreement" is not an oxymoron.

■ Of course if the condition is a condition not of committing the agreed-upon acts (in this case, burning down number 2438), but of agreeing in the first place, there is no criminal conspiracy unless and until the condition is satisfied. If Podolsky had merely said to Ziedman, "I'll discuss 2438 with you if and when you prove to me that you've gotten all the people out," there would be no agreement to burn down 2438. There would only be an agreement to negotiate at some future date, and an agreement to negotiate an agreement to commit arson is not an agreement to commit arson. See *United States v. Melchor-Lopez*, 627 F.2d 886, 892 (9th Cir.1980); cf. *United States v. Jones*, 765 F.2d 996, 1002–03 (11th Cir.1985).

■ The judge found that the agreement was a conditional agreement to burn down number 2438, and not merely an agreement to agree to burn it down if and when Podolsky was satisfied that there was no one in the building. The evidence supports this finding. After much to-ing and fro-ing on the question whether everyone would be got out of 2438, the following exchange took place between Ziedman and Podolsky:

Z: They are going to be out. You going to do it or not?

P: Sure.

Z: If you don't, say "no." Just tell me.

P: Yeah. I told you.

This was the meeting of the minds, creating an agreement (which Hawkins joined), though one implicitly conditioned on Podolsky's satisfying himself when he showed up at 2438 to burn it down that it really was empty of people.

The First Circuit suggested in the *Anello* case that not every conditional agreement to commit an offense is punishable as a conspiracy; the "test for conspiratorial liability [in such a case] should focus on subjective or objective likelihood that condition will be fulfilled," 765 F.2d at 263, summarizing Note, *Conditional Objectives of Conspiracies*, 94 Yale L.J. 895 (1985). The

court must have been worried that without some attention to the likelihood of the condition's being fulfilled, all sorts of fantastic hyperbole might become punishable ("I agree to horsewhip Idi Amin if he ever shows his face on Rush Street"). Since, however, section 371 requires the commission of an overt act, as well as an agreement, we doubt whether it is necessary to complicate the trial of conspiracy cases by making likelihood of fulfilling all conditions another element of the crime. As all agreements, including all conspiracies, have some conditions, implied or expressed, "subjective or objective likelihood" could become an issue in every conspiracy trial. What is true is that the more fantastic the condition, the lower the probability that the defendant actually agreed to commit an offense. Certainly if the conditions were known to be impossible of fulfillment when the agreement was made (mere supervening impossibility would not defeat a conspiracy charge, see *United States v. Jones, supra,* 765 F.2d at 1002), the agreement could not sensibly be understood as an agreement to do something; it would be a mere rhetorical flourish.

But we need not decide in this case how to deal with the situation where an agreement is conditioned on an event that is highly unlikely ever to occur. The condition in this case—that Ziedman get the people out of number 2438—was not of that type. Podolsky and Hawkins were satisfied with Ziedman's assurances and proceeded to the building. The lighted window warned them off, but this is the kind of mischance that often crowns a conspiracy with failure—without making the conspiracy innocent.

The other issue raised by the appeal is whether Podolsky's conviction (the entire conviction—not just the conviction for conspiracy) should be set aside in order to punish the government for "manufacturing" federal jurisdiction by steering Podolsky to number 2438. Admittedly it is not obvious why the federal government's plainclothes police are interested in Chicago firemen who do arson for hire on the side. Arson is a terrible crime and there is no

suggestion that Podolsky was either part of an interstate gang or capable of setting fires that might have a substantial interstate effect. In either case investigation and prosecution at the state level might involve serious problems of interstate coordination, and in such cases federal prosecution of crimes that are also state crimes makes obvious good sense.

Arson committed by means of explosives had been made a federal crime in 1970 in reaction to campus bombings by radical groups, and the limitation to explosives had been removed in 1982 mainly because of the difficulties of defining "explosive" and of establishing whether the arson had been caused by an explosive or by something else. See H.R.Rep. No. 1549, 91st Cong., 2d Sess. 36, 194–95 (1970), U.S.Code Cong. & Admin.News 1970, p. 4007; H.R.Rep. No. 678, 97th Cong., 2d Sess. 1–3 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2631–2633. So this case is fairly remote from the concerns of Congress. See also Hearing Before the Subcomm. on Crime of the H. Comm. on Judiciary on H.R. 6377 & H.R. 6454 (Anti-Arson Act of 1982), 97th Cong., 2d Sess., ser. 121, at 23 (May 19, 1982) (testimony of assistant director of criminal enforcement, Bureau of Alcohol, Tobacco and Firearms that "arson crimes are complex, multijurisdictional, and geographically unconfining in nature. The presence of organized crime and white-collar criminals further compounds the investigative problem").

In any event, having gathered ample evidence that Podolsky was conspiring to burn down a vacant building, the federal agents could have turned the evidence over to the local authorities rather than induce Podolsky to commit a federal crime. The record does not indicate why this was not done, but the reason is not important. The responsibility for wise management of scarce prosecutorial and other governmental resources is not a judicial responsibility. *United States v. Schwartz,* 787 F.2d 257, 266 (7th Cir.1986); *Rockford League of Women Voters v. NRC,* 679 F.2d 1218, 1222 (7th Cir.1982). Although the govern-

ment's inducing a person to commit a crime sometimes gives the person (if he is prosecuted) a defense of entrapment, entrapment is not and could not be argued here, because Podolsky was predisposed to commit the crimes that Ziedman, acting on the government's behalf, hired him to commit. See *United States v. Manzella*, 791 F.2d 1263, 1269–70 (7th Cir.1986), and cases cited there.

■ Podolsky contends, however, that *United States v. Archer*, 486 F.2d 670 (2d Cir.1973) (Friendly, J.), requires that his conviction be set aside because the agents steered him to commit a crime within federal criminal jurisdiction. In *Archer* a federal agent named Bario, belatedly realizing that the conduct he was investigating (the receipt of bribes by Archer, a local official) was not a federal crime, placed phone calls to Klein, a lawyer in cahoots with Archer, from another state in order to induce a violation of the Travel Act, 18 U.S.C. § 1952. Klein did not take the calls, but Bario left a message that Klein should call him back, and Klein did so. See 486 F.2d at 673–74, 681–82. The court described it as a case of "manufactured jurisdiction." *Id.* at 682. The present case is different. The Bureau of Alcohol, Tobacco and Firearms did not put 2438 West Division Street into interstate commerce; it was there all the time; they just induced Podolsky to direct his criminal intentions there. The case would be closer to *Archer* if 2438 had a vacant building and the government had opened a store there in order to put the building into interstate commerce.

Although *Archer* was decided 13 years ago, no conviction has ever been set aside on the sole basis of the principle announced by it, even in the Second Circuit. The closest to such a case is *United States v. Brantley*, 777 F.2d 159, 163 (4th Cir.1985), where the Fourth Circuit said that its decision to reverse the defendants' conviction for extortion was "influenced" by *Archer*. In *Brantley* the FBI set up a phony gambling den in which FBI agents gambled and drank, using money given them by the FBI for this purpose. The den hired the defendants for protection. The gambling equipment and the liquor had been transported across state lines, and this transportation was the basis for the charge that the defendants had violated the federal extortion statute (the Hobbs Act). The Fourth Circuit held that since the purpose of the interstate transportation had not been commercial—the equipment and liquor had been transported interstate in order to be provided free of charge to the FBI agents—the Hobbs Act had not been violated; the extortion had not taken place in interstate *commerce.* See *id.* at 161–63. Whether or not this reasoning is sound, a question unnecessary to resolve in the present case, it is different from that of the *Archer* decision, where the court seems not to have been doubted that the interstate telephone network was a "facility in interstate ... commerce" (18 U.S.C. § 1952(a)).

Except in the *Brantley* case, *Archer* has been cited only to be distinguished, as in the three citations in this court. See *United States v. Murphy*, 768 F.2d 1518, 1528 (7th Cir.1985); *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983); *United States v. Gardner*, 516 F.2d 334, 345 (7th Cir.1975). *Gardner* distinguishes *Archer* on the interesting ground that the defendants in *Archer* were not predisposed to commit the crime with which they were charged, so that it was really an entrapment case. Although *Archer* treats the use of the telephone as a jurisdictional requirement of the Travel Act, in just the same way that stealing goods' having a value of at least $5,000 is a jurisdictional requirement of the statute that punishes the transportation of goods or other things of value in interstate or foreign commerce, 18 U.S.C. § 2314, the Travel Act makes the *use* of the interstate telephone network the crime, 18 U.S.C. § 1952(a), just as the wire-fraud statute makes the interstate or international wire communication the crime, 18 U.S.C. § 1343. So *Archer* could readily have been framed as an entrapment case: Bario induced Klein to violate the Travel Act; was Klein predisposed to violate it?

Representative cases in other circuits distinguishing *Archer* are *United States v. Zambrano,* 776 F.2d 1091, 1098–99 (2d Cir. 1985); *United States v. Lau Tung Lam,* 714 F.2d 209 (2d Cir.1983); *United States v. Romano,* 706 F.2d 370, 373–74 (2d Cir. 1983); *United States v. Garrett,* 716 F.2d 257, 266–68 (5th Cir.1983); *United States v. Faison,* 679 F.2d 292, 293–95 (3d Cir. 1982) (en banc); *United States v. Jannotti,* 673 F.2d 578, 610–11 (3d Cir.1982), and *United States v. O'Connor,* 635 F.2d 814, 817–18 (10th Cir.1980). For criticism of the opinion see Dix, *Undercover Investigations and Police Rulemaking,* 53 Tex.L. Rev. 203, 281–82 (1975). *Archer* was said in *United States v. Bagnariol,* 665 F.2d 877, 898 n. 15 (9th Cir.1981), to have been "severely restricted" by later decisions, and we are not the only court to have described it as a case of "virtual entrapment." See *United States v. Hall,* 536 F.2d 313, 327 (10th Cir.1976); *United States v. Bagnariol, supra,* 665 F.2d at 898; cf. *United States v. Gambino,* 566 F.2d 414, 419 (2d Cir.1977). Maybe the result in *Archer* is best explained on the ground that the facts did not show a federal crime. Agent Bario's use of the telephone was hardly the sort of thing that Congress had in mind in passing the Travel Act, and the court attached no significance to the fact that Klein had returned Bario's calls rather than being in to receive them when they were made. See 486 F.2d at 681.

The course of decisions casts doubt if not on the result in *Archer* then on the vitality of the independent principle announced there that forbids the "manufacture" of federal jurisdiction in circumstances not constituting entrapment and not canceling any element of the crime such as criminal intent. The opinion in *Archer* is suffused with disapproval of the government's conduct (which included much more than Bario's use of the phone—such as fraud on the grand jury), of efforts in general to prosecute local misconduct federally, and of the hastily drafted Travel Act itself. See also Friendly, *Federal Jurisdiction: A General View* 56–61 (1973). But what the government actually did in *Archer* was like the purchase of illegal drugs by an undercover agent of the Drug Enforcement Administration—also a sham transaction designed to induce a crime to be committed at a time and in a place convenient to the government. Klein knew when he returned Bario's calls that he was making an interstate phone call and one related to the corrupt practices for which he and Archer were later prosecuted, so there could be no argument that Klein lacked criminal knowledge or predisposition.

■ We are mindful of the possibility that investigative conduct not forbidden by any specific doctrine might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973); see *United States v. Kaminski, supra,* 703 F.2d at 1009; *United States v. Bogart,* 783 F.2d 1428, 1432 (9th Cir.1986); Comment, *Entrapment and Due Process: How Far Is Too Far?,* 58 Tul.L.Rev. 1207 (1984). No conviction has ever been reversed on this ground by this circuit, however, and the present case is not a good candidate for pathbreaker. The government's conduct was not outrageous. The decision to steer Podolsky to number 2438 rather than to hand him over to the Chicago police may or may not have been a wise exercise of administrative discretion, but the federal courts do not review the exercise of such discretion unless it is based on invidious grounds, for example race. *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985). The remedies for wasting the federal taxpayer's money on investigatory and prosecutorial activities better left to the cities and states are political rather than judicial; all other objections to an aggressive judicial role in this area to one side, judges lack the information necessary to evaluate prosecutorial decisions in areas of concurrent federal and state criminal jurisdiction. *United States v. Schwartz, supra,* 787 F.2d at 266.

The judgment of the district court is AFFIRMED.