**UNITED STATES of America, Plaintiff,**

v.

**David J. SHIELDS and Pasquale F. DeLeo, Defendants.**

**No. 90 CR 1044.**

United States District Court, N.D. Illinois, E.D.

July 25, 1991.

---

Thomas M. Durkin, Michael J. Shepard, Asst. U.S. Attys., Chicago, Ill., for U.S.

Dan K. Webb, Steven F. Molo, Winston & Strawn, Chicago, Ill., (G. Robert Blakey, Notre Dame Law School, Notre Dame, Ind., of counsel), for defendant David J. Shields.

Samuel V.P. Banks, Allan A. Ackerman, Joelle Hillory Hollander, Allan A. Ackerman, P.C., Chicago, Ill., for defendant Pasquale F. DeLeo.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

## I. INTRODUCTION

In Count Five of the superseding indictment in this case, defendants David J. Shields and Pasquale F. DeLeo are charged with causing FBI undercover agent James Nixon to travel in and use the facilities of interstate commerce from August 24, 1988 to August 29, 1988 in order to facilitate unlawful activity (namely, bribery) in violation of the Travel Act, 18 U.S.C. § 1952. Shields has moved to dismiss this count of the indictment, contending that the facts underlying the charge reveal no effort on his part to cause Agent Nixon to travel in or use the facilities of interstate commerce. DeLeo has moved to dismiss on the same

grounds. For the reasons set forth below, defendants' motions are denied.[1]

## II. FACTS

The facts, for purposes of this motion, are not in dispute. They are alleged in detail in the indictment, and further fleshed out by the tape recordings and transcripts of electronically monitored conversations involving the defendants. As it must on a motion to dismiss, the Court has assumed the allegations of the indictment to be true, and has drawn all inferences which reasonably arise from the indictment and the recorded conversations in favor of the government. *See United States v. Barta*, 635 F.2d 999, 1002 (2d Cir.1980). However, the Court means to express no opinion as to the merits of the government's case against the defendants; the Court's task here is solely to determine whether the indictment states a legally cognizable Travel Act charge against the defendants.

The undercover investigation which produced the indictment in this case was conducted through a mock lawsuit filed in the Circuit Court of Cook County, Illinois, Chancery Division in 1988. (Indictment ¶ 1(e).) That case, *Nichols v. Wilson*, No. 88 CH 6337, was randomly assigned to defendant Shields, presiding judge of the Chancery Division.[2] (*Id.*) Robert J. Cooley, an attorney cooperating with the FBI in its investigation, posed as the plaintiff's attorney, and Nixon posed as the plaintiff (Nichols). (*Id.*) Other FBI agents assumed the roles of the defendant (Wilson) and his attorney, Judson Doss. (*See id.*) Nixon was based in the state of Washington, and thus was required to travel to

---

1. DeLeo's motion to dismiss is cursory, and merely reiterates the arguments Shields has raised in support of his own motion. Accordingly, the reasons the Court has articulated in denying Shields' motion apply to DeLeo's motion as well. In the "partial additional pretrial motions" which DeLeo has subsequently filed, DeLeo does raise one argument not raised by Shields. DeLeo contends that Count Five must be dismissed because it fails to describe in any detail what DeLeo did to cause the interstate travel or to further the alleged bribery. (DeLeo Partial Additional Pretrial Motions at 13–14.) Although Count Five itself may be cursory, Paragraph 10 lends considerable detail as to DeLeo's alleged encouragement of interstate

travel, and subsequent paragraphs set forth a number of acts which later occurred in the course of the purported scheme. Moreover, any disadvantage that DeLeo might suffer in the absence of further detail in the indictment certainly is eliminated by the recordings of the relevant conversations between Cooley, DeLeo, and Shields, which have long been available to defendants. Thus, the Court finds no merit to this objection.

2. The suit purported to concern a financial dispute between the parties, who had formed an investment partnership.

Illinois when court appearances in the *Nichols* case were necessary.

On August 19, 1988, Cooley moved before Shields for a temporary restraining order on behalf of his client.[3] According to the indictment, Cooley had previously met with DeLeo, who had represented that Shields would rule favorably to Cooley's client in exchange for money. (Indictment ¶¶ 4–5.) Cooley had agreed to pay DeLeo $2,500 for delivery to Shields in exchange for favorable treatment on Cooley's forthcoming motion for a temporary restraining order. (*Id.* ¶ 5.) Cooley delivered the money to DeLeo prior to the hearing on August 19. (*Id.* ¶ 6.) Cooley subsequently appeared before Shields, who granted his motion. (*Id.* ¶ 7.) Only Cooley and Nixon were present at that hearing. At that time, a preliminary injunction hearing was scheduled for August 29, 1988.

The indictment alleges that Cooley met with DeLeo again on August 24, 1988. (Indictment ¶¶ 9–10.) It further alleges:

> [W]hen Cooley told defendant PASQUALE F. DELEO that the attorney for Wilson, Cooley's opponent, was planning to ask for a hearing and that Cooley's client, (Nichols) was in Seattle, defendant PASQUALE F. DELEO told Cooley that Cooley did not need to avoid a hearing: "let this guy [defendant DAVID J. SHIELDS] rule he's going to keep the money locked up ... get in touch with your client, tell him to be there, I'll make sure this guy [defendant DAVID J. SHIELDS] rules in your favor." Cooley and defendant PASQUALE F. DELEO discussed paying defendant DAVID J. SHIELDS "another two bits" [$2500] for his continuing assistance.

(*Id.* ¶ 10.)

On August 29, 1988, the date previously scheduled for the preliminary injunction hearing, Cooley appeared before Shields on behalf of Nichols. Barbara Newhouse, an FBI agent posing as Doss' secretary, appeared on behalf of Wilson. Newhouse explained that Doss was out of town, but would be returning that evening. (Tran-

script at 2, Tape No. 177, Aug. 29, 1988.) Cooley reported that his own client was also out of town in Seattle, but upon inquiry from Shields, indicated that he "will have him back tomorrow." (*Id.* at 3.) Shields continued the hearing until the following day, and indicated that the temporary restraining order would remain in effect until that time. (*Id.*)

The parties (including Nixon) appeared before Shields on the following day. After holding a conference with them in an attempt to settle the case, Shields granted a preliminary injunction in favor of Cooley's client. (Indictment ¶ 12.) Allegedly, Cooley then paid $2,500 to DeLeo, who in turn paid Shields. (*Id.* ¶¶ 13, 14.)

Agent Nixon's travel to Illinois for purposes of the August 30, 1988, hearing is the foundation for the Travel Act violation alleged in Count Five. Shields challenges his liability for that purported violation on two grounds: (1) The circumstances underlying the Travel Act charge in this case do not fall within the intended scope of the Act; and (2) the government manufactured federal jurisdiction under the Travel Act by employing an out-of-state agent in its undercover investigation. Emphasizing that neither he nor DeLeo are alleged to have engaged in interstate activity themselves, Shields contends that he can only be held liable under the Travel Act to the extent he actively encouraged the interstate conduct of Nixon in furtherance of the bribery alleged in the indictment. Shields argues that the facts here do not reveal any such encouragement, because the decisions to file a case in Illinois court and to use an out-of-state agent were made by the government, not by Shields or DeLeo. "Having made these decisions, travel by Nixon to Chicago was a foregone result, and, under the circumstances, there was very little or nothing that Shields or DeLeo could have done to prevent such travel." (Shields Mem. at 10.) Shields contends that the only influence he might have exercised with respect to Nixon's travel was to schedule the hearings for which Nixon would

---

**3.** The order which Cooley sought and ultimately obtained was one freezing hundreds of thousands of dollars in a bank account purportedly belonging to the defendant (Wilson).

inevitably have to travel to Chicago, and these dates he set at the parties' (*i.e.* the government's) convenience. Thus, in Shields' view, he did nothing to encourage Nixon's interstate travel and cannot properly be held liable under the Travel Act.

The government contends that in light of what transpired on August 24, 1988, the Travel Act charge against Shields and DeLeo is well founded. Because the government's argument rests principally upon the exchange between Cooley and DeLeo on that date, it is useful to quote in full from the relevant portion of the transcript of this conversation [4]:

DELEO: What you doin?

COOLEY: Not much. The ah, this thing is due back up on Monday at 11:00 for a hearing. I talked to (IA) attorney and he's obviously hot now that I locked up the account without him being there. They weren't there the last time when I got the account locked up. His client is furious because his client needs some money right now.

DELEO: Ok.

COOLEY: Apparently the guy needs like a hundred thousand to do something and he came back into town and went to the bank and couldn't touch the money. Got a hold of the lawyer and then blew up. Blew up ski-hi. The thing is set for eleven o'clock Monday. My thing is if we can avoid, in other words, if I can avoid a hearing, if we have a hearing the judge is liable to have to give him something at a hearing. If I can avoid having a hearing, the judge told me to take a ten day date he said. He said mark down a date in ten days so I talked to his clerk and I got the twenty-ninth which is next Monday. If we can get this thing put over for a couple of weeks, the hearing for two or three weeks, this guy's got to work a deal with me then.

The other guy needs some money out of the account. The only way (IA) get the money be ...

DELEO: Well why, let me ask you a question, why do you think you'd lose the hearing?

COOLEY: I don't know, I mean I just don't know what he'll do. (IA) who knows if the other guy screams and yells, if the judge, if the guy even cops a plea and says to him you know judge let me take out twenty or thirty or fifty thousand, he might even say let me take out a hundred thousand dollars because at least half of that money is mine, you know what I'm sayin, and if he does that then I'm fucked. Then I can't squeeze this guy. Then my thought was if my client doesn't show up on Monday, if my client's not there on Monday and I ask for a continuance for that reason, because my client's not there ...

DELEO: No, see that won't work. 'Cause you're locking up the guys account ...

COOLEY: Yeah I know and that's the whole thing Patty if I can lock his account up I can collect, you know I can force him to pay me some money.

DELEO: That doesn't work.

COOLEY: Well I may have a problem then because my guy maybe can't come in on Monday. You know they gave us the date and my guys in Seattle right now, and he's got something doing out there. He's got some big meeting set up out there where he can make a ton of money and I doubt if he can get in.

DELEO: Oh I doubt if you (IA) put it over for two weeks.

---

**4.** Although the August 24, 1988 conversation between Cooley and DeLeo is only briefly paraphrased in the indictment, and resort to the transcript takes the Court beyond the four corners of the indictment, Shields himself agrees that it is appropriate for the Court to consider facts not alleged in the indictment and expressly invites the Court do so. (Shields Mem. at 1 n.

1.) *See United States v. Gonzales*, 620 F.Supp. 1143, 1145 (N.D.Ill.1985) (Moran, J.) ("[w]hile the counts, as a pleading matter, sufficiently allege effect on commerce, the factual development by memoranda permits the court to address the jurisdictional issues"); *United States v. Freedman*, 562 F.Supp. 1378, 1381 n. 7 (N.D.Ill. 1983) (Shadur, J.).

COOLEY: But I mean you see Pat what I'm saying is the longer I can put it over the better off I am.

DELEO: I understand that.

COOLEY: If, you know, if it's put over for a week this guy can maybe survive, if its a couple weeks, I can maybe ...

DELEO: Oh look (IA) comin' (IA).

COOLEY: ... I can maybe cut a deal then right now with this guy and get a big package of money out of the deal, you know what I'm sayin. If he's hurtin for the money, if he has to get the money (IA) I'm just sayin, well tell me what do you think I should do? What would be the best way to try to do something to squeeze this guy?

DELEO: Try to have your guy in and go to hearing and let this guy rule that he's going to keep the money locked up.

COOLEY: What if I have (IA) in an affidavit from my guy. (IA) My guy can't be there, if I drop an affidavit.

DELEO: The reason why, what was the reason why you're holding the money? (IA)

COOLEY: Because we claimed that we're entitled.

DELEO: (IA)

COOLEY: (IA) it was it was. The money was, this guy took two hundred fifty thousand dollars out of both their accounts. It was out of both of their, I mean it was an account in both their names. He moved it over here ...

DELEO: You had that.

COOLEY: Pardon.

DELEO: You had that.

COOLEY: Yeah.

DELEO: Get in touch with your client and tell him to be here.

COOLEY: Ok.

DELEO: *I'll* [5] make sure this guy rules in your favor.

COOLEY: Ok.

DELEO: And call me Monday morning so I could walk over there and see him.

COOLEY: Alright well tell where to you know, give me an idea to ...

DELEO: We'll talk about 9:30.

COOLEY: Alright, but I mean, with him (IA) was he happy with what I gave him before.[6]

COOLEY: Ok, as long as he's happy that's the, you know that's the main thing.

DELEO: *He say* look, (IA) *me* (IA) comin up later I says, I don't know with the way it's going all we want (IA) lock it up right.

COOLEY: In fact, give me, give me a figure on what I, I need to get this think done lets do it. I'd like to work this whole thing. If this guy, if, I don't care what it costs, Pat I mean to an extent, I mean you know ...

DELEO: No I ... Bob.

COOLEY: ... to an extent.

5. The defense has objected to the accuracy of this transcript with respect to three instances in which the government has indicated DeLeo using particular words and, in the defendants' view, DeLeo's remarks are actually inaudible on the tape. These passages have been highlighted here in order to indicate the dispute. The Court has listened to the tape recording of this conversation and determined that the particular passages in question are audible, and that the government's version of the transcript is therefore correct in its entirety. Of course, it remains for the jury to determine what the speakers actually said in each instance, and in an abundance of caution, the Court has ordered alternate versions of the disputed passages in this transcript prepared for the jury's comparison in order to given the defendants every benefit of the doubt. (*See* Memorandum Opinion and Order dated July 10, 1991 at 2 ¶ 5.) But for present purposes, in light of the Court's ability to make out the passages which the defendants claim are inaudible, it is appropriate to include the passages in the transcript of the conversation.

Throughout this opinion, the Court has discussed certain inferences which may be drawn from the transcript. These remarks, of course, are based not only upon the transcript, but also upon the actual tape recording, which the Court has reviewed several times.

6. The original draft of this transcript reflected an audible response of "Yeah" to Cooley's question. The government has since revised the transcript to reflect the lack of any audible response.

DELEO: Bob, you know, what the fuck (IA) I'm in, I'm in with you for the fees so I don't give a fuck (IA).

COOLEY: He's gotta, he's gotta, he's gotta take ...

.    .    .    .    .

COOLEY: ... You tell me, you know again, you know I know he'll take some heat from the other side. If he can get me couple weeks date Pat, we can probably get this whole thing done. In other words if he can get me a couple weeks date.

DELEO: (IA) *Let's give him another two bits.*

COOLEY: Alright fine if thats fair with him, will he, will he give about a two week date then, without my guy being here, I mean ...

DELEO: No.

COOLEY: can he do it without ...

DELEO: You gotta have your guy. (IA)

COOLEY: What if I bring an affidavit.

DELEO: No because (IA) your guy's here then he could say, you know its (IA) be made much better.

COOLEY: Oh I know that I mean sure, if, but if I bring an affidavit from my guy indicating (IA) emergency, if I make an emergency, lets say I make it an emergency, I don't want to say death in the family they can prove that's bullshit but if I make some other family emergency.

DELEO: I don't know, I don't know, I (IA) I think.

COOLEY: I know, I know. (IA)

DELEO: You know you've been. (IA)

COOLEY: (IA) Hopefully he'll take a little bit of heat, you know, I mean the other, the other side will be screamin bloody murder, but I mean, then if I even ask for a week, even a week, we'll probably get ...

DELEO: (IA) for two weeks.

COOLEY: Well I'll ask for two weeks.

DELEO: But you're not gonna have your guy here?

COOLEY: Well I don't think he can make it Pat that's the problem with it.

This guy can make a ton of money on something else.

DELEO: (IA) You're gonna say (IA) this money was taken from a partnership account.

COOLEY: It was taken from a joint account in both their names. But (IA) tell him not to give this guy any fuckin money I mean this guy's gonna ask to take a hundred thousand or fifty thousand.

DELEO: (IA)

COOLEY: Tell him that you know no money for him.

DELEO: Tell me (IA) tell me Monday mornin.

COOLEY: Alright well its eleven o'clock I'll meet you up there then if its no problem.

DELEO: No but call me like about 9:00 so I can walk over and see him.

COOLEY: Ok great. I'll give you a call for sure Monday and then well go from there.

DELEO: Yeah.

COOLEY: Alright. Pat listen if, if ahead of time you think it's a real problem I mean, (IA) see I can't get this guy in.

DELEO: I'll try to get up and see him.

COOLEY: You know.

DELEO: (IA) If the guy was here it'd be so much better.

COOLEY: This guy's gonna pay me big money to do something for me if I can do without him being here ...

DELEO: (IA) want him to say to me you know what the fuck, your (ui) your fuckin' guy's client wasn't even there.

DELEO: (IA) you know, you know ...

DELEO: You know giving him an out.

COOLEY: I, I, I understand, but I mean that's why ...

DELEO: See he thinks if ...

COOLEY: If it's gonna take more so be it.

DELEO: He thinks there's a lot of stuff so I don't think, he wants to do it.

COOLEY: Pat there is a lot of money involved.

DELEO: Well I know that but I don't want to give him an opportunity to back out, I don't think he will because I think he wants to be, stay in.

COOLEY: Ok.

DELEO: Ok?

COOLEY: Alright.

(Transcript at 1–7, Tape No. 170, Aug. 24, 1988.[7]) In the government's view, the transcript makes clear that it was DeLeo who repeatedly pressed Cooley to bring his client in from Washington for the forthcoming hearing, while Cooley kept searching for some means to excuse his client's presence yet keep the injunction in effect. Consequently, the government argues, there is no doubt that it was DeLeo, not Cooley or the government, who caused Agent Nixon to travel to Chicago. (Gov. Mem. at 14.) The government further contends that because Nixon's presence at the hearing was sought as a means to justify a ruling in Cooley's favor, for which Shields was to be paid, there is also no question that the interstate travel facilitated the bribery. (*Id.* at 15.) Finally, because DeLeo and Shields were co-conspirators (Indictment ¶ 2), the government argues, DeLeo's acts of facilitating Nixon's interstate travel may be attributed to Shields. (Gov. Mem. at 15.)

A. *Liability under the Travel Act*

In relevant part, the Travel Act provides:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of any unlawful activity;  or

(2) commit any crime of violence to further any unlawful activity;  or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. § 1952. Subsection (b) of the Act defines "unlawful activity" to include bribery committed in violation of state or federal law. *Id.* § 1952(b)(2). As set forth above, the government contends that Shields and DeLeo are subject to liability under the Travel Act[8] for having caused Agent Nixon to travel in interstate commerce in order to further the commission of bribery in violation of Ill.Rev.Stat., ch. 38, ¶ 33–1(e) and thereafter having continued to engage in this illegal activity. (Indictment Count Five.)

Shields has voiced three separate grounds in support of his first contention that the facts alleged in support of Count Five do not fall within the intended reach of the Travel Act: (1) neither of the defendants themselves engaged in interstate activity by crossing state lines, and Shields did not cause anyone else to do so; (2) the interstate travel by FBI Agent Nixon was fortuitous and incidental; and (3) the nature of the substantive conduct with which he and DeLeo are charged does not implicate federal concerns.

■ Shields' first argument fails in light of the facts underlying the Travel Act charge in this case. From a trio of cases reversing Travel Act convictions, Shields perceives a "common thread": that in each, the defendant had not personally engaged in interstate activity. (Shields Mem. at 9.) Yet, a review of the circumstances and holdings of these three cases supplies a ready basis for distinguishing them from the instant case; here the allegations suggest that the defendants played a much more direct role in procuring the interstate travel underlying the Travel Act charge.

In *Rewis v. United States*, 401 U.S. 808, 811–12, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493

---

**7.** The transcript quoted from is the revised version prepared by the government and submitted to the Court by letter dated July 12, 1991. Accordingly, all cites to the transcript are to the revised version.

**8.** Alternatively, the government alleges that the defendants are liable under the aiding and abetting provision of the Criminal Code, 18 U.S.C. § 2. (Indictment, Count Five.)

(1971), the Supreme Court held that the proprietors of a lottery operation could not be held liable under the Travel Act simply because their out-of-state customers had crossed state lines in order to gamble at their establishment. The Court stressed that the legislative history of the Act indicated that it "was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." *Id.* at 811, 91 S.Ct. at 1059. *See also id.* at 811 n. 6, 91 S.Ct. at 1059 n. 6, quoting S.Rep.No. 644, 87th Cong., 1st Sess., 2–3, dated July 27, 1961 (" 'Obviously, we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise.' "). Although the Court found it noteworthy that the defendants themselves had not crossed state lines in furtherance of their illicit enterprise, it also stressed the absence of evidence that the defendants had caused others to do so. *Id.* at 814, 91 S.Ct. at 1060. The mere fact that it may have been foreseeable to the defendants that the residents of other states would patronize their business did not suffice as a basis for liability, the Court reasoned. *Id.* at 812–13, 91 S.Ct. at 1060. Moreover, although the Court acknowledged that the Travel Act properly might apply to the "active encouragement of interstate patronage," it admonished that active encouragement required more than simply conducting the illegal operation. *Id.* at 813, 91 S.Ct. at 1060.

In *United States v. Altobella*, 442 F.2d 310, 315 (7th Cir.1971) (Stevens, J.), the Seventh Circuit reversed the defendants' conviction under the Travel Act because, although the evidence presented at trial proved that they had committed extortion in violation of Illinois law, the record demonstrated neither that there was a need for federal intervention into the domain of state law enforcement nor that the interstate activity involved was anything more than "minimal and incidental." The defendants in *Altobella* had employed a young entertainer to lure an unwitting Philadelphian visiting Chicago on business into a hotel room, where the defendants captured him on film in a compromising position. The defendants then demanded that their victim pay them money to keep quiet. He ultimately gave them $100 after cashing a personal check for that amount. The check was forwarded by mail to the victim's Philadelphia bank after it cleared in Chicago. Although the court agreed that the Travel Act's prohibition against use of interstate facilities in connection with the distribution of proceeds from unlawful activity "[could] be read to cover this case," it nonetheless concluded that the circumstances fell beyond the intended reach of the Travel Act. *Id.* at 311.

To warrant federal intervention we believe the statute requires a more significant use of a facility of interstate commerce in aid of the defendants' unlawful activity than is reflected on this record....

... The use of the mails by the bank through which appellants' victim's check was cleared, a few days after it had been cashed at the Sherman House, was purely incidental to appellants' sordid scheme. Their purpose would have been achieved equally well if the victim had borrowed $100 from associates at the hotel or written a check on a local bank.... [W]hen both the use of the interstate facility and the subsequent act are as minimal and incidental as in this case, we do not believe a federal crime has been committed.

Unquestionably appellants' unsuccessful attempt "to make a fast buck" is punishable as a crime. We merely hold that the State of Illinois is the appropriate sovereign to prosecute their offense. We do not believe Congress intended to authorize federal intervention in local law enforcement in a marginal case such as this....

*Id.* at 314–16 (citations and footnotes omitted).

A short time after it decided *Altobella*, the Seventh Circuit struck down another Travel Act conviction in *United States v. McCormick*, 442 F.2d 316 (7th Cir.1971) (per curiam). In that case, the defendant

had operated a lottery which was forbidden by Indiana law. In order to recruit salespeople to peddle tickets, he placed an advertisement in a weekly Indiana newspaper. Several hundred copies of the newspaper were mailed to out-of-state subscribers, and the government asserted that this circumstance established use of the U.S. mails to facilitate an unlawful activity. The court of appeals disagreed. The court noted the lack of evidence that the defendant had actually hired any out-of-state salespeople or even that he had sought out such individuals; indeed, the record indicated that he had sought to keep his enterprise within Indiana borders. *Id.* at 317. Relying upon the Supreme Court's opinion in *Rewis* and its own decision in *Altobella,* the court found the nexus with interstate activity too tenuous to support the conviction:

> Here too the activities engaged in by defendant were essentially local. The role played by the interstate mailings was "a matter of happenstance" and "minimal and incidental" to the operation of the illegal lottery. As in *Rewis* and *Altobella,* the interstate activities relied upon by the Government were the acts of others and were not actively sought or made a part of the illegal activity of the accused. There was no showing that defendant's lottery in any way depended upon or included interstate operations.... We must therefore conclude that no federal crime was committed, and that the State of Indiana is the only appropriate authority to punish defendant for maintaining this local lottery.

*Id.* at 318. *See also United States v. Markowski,* 772 F.2d 358, 365 (7th Cir.1985) (defendant's interstate travel in connection with legitimate business, which served as a front for marijuana and cocaine smuggling operation, related only incidentally to the illegal activity), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *United States v. Isaacs,* 493 F.2d 1124, 1146–49 (7th Cir.) (where proceeds of bribery were distributed to Illinois residents by way of check drawn on Illinois bank, and checks fortuitously cleared through Federal Reserve Bank in Missouri, the jurisdic-

tional element of the Travel Act was not satisfied), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

Turning to this case, it quickly becomes apparent that the record presents a far more substantial basis for liability under the Travel Act. Based upon the facts alleged, the defendants may be held liable for causing the interstate travel of Agent Nixon. It is immaterial that neither Shields nor DeLeo themselves crossed state lines in furtherance of the alleged bribery scheme. As Shields himself acknowledges, one who actively encourages interstate travel by another in furtherance of unlawful activity is subject to liability under the Travel Act. (Shields Mem. at 9.) *See Rewis, supra,* 401 U.S. at 813, 91 S.Ct. at 1060. In light of the particular circumstances underlying Count Five, vicarious liability may be imposed upon Shields on this basis.

That interstate travel by Cooley's "client" may have been inevitable in the course of the investigation given the government's decision to employ an out-of-state agent is ultimately immaterial. Contrary to Shields' contention, the Travel Act charge is not based upon interstate travel which was either routine or initiated solely by the government. Rather, assuming the relevant allegations of the indictment to be true, and granting the government the benefit of favorable inferences which may reasonably be drawn from the foregoing conversation between Cooley and DeLeo on August 24, 1988, one may fairly conclude that Nixon's travel to Illinois for the August 30, 1988 hearing was actively encouraged by DeLeo. The transcript tends to bear out the government's contention that Cooley went into the August 24 meeting with DeLeo hoping to arrange a continuance of the temporary restraining order without Nixon having to be present at the forthcoming hearing, and that it was DeLeo who pressed Cooley to bring Nixon in from Washington despite Cooley's entreaties for an alternate arrangement. (*See, e.g.,* Transcript at 5: "You gotta have your

guy.")[9]

One may also reasonably conclude from the transcript that DeLeo solicited Nixon's attendance at the hearing in furtherance of the bribery scheme. As the court explained in *United States v. Raineri*, 670 F.2d 702, 717 (7th Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982): "The benefit sought or gained from the interstate travel or use need not be essential to the illegal activity. It need only hold the promise of facilitating that activity." (Citations omitted.) *Accord United States v. Muskovsky*, 863 F.2d 1319, 1327 (7th Cir.1988), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). *See also United States v. Miller*, 379 F.2d 483, 486 (7th Cir.) ("As used in [the Travel Act], 'facilitate' means 'to make easy or less difficult.'"), *cert. denied*, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967). Moreover, although the interstate travel "must relate significantly, rather than incidentally or minimally, to the illegal activity," *Raineri*, 670 F.2d at 717, "[w]e test the sufficiency for the jurisdictional basis (the interstate element), not by black-letter rules but by 'the nature and degree of interstate activity in furtherance of the state crime,'" *id.* (citations omitted).

Here, no great insight is required to understand that the presence of Cooley's client at the hearing might make it easier and less suspect for Shields to rule in Cooley's favor. Thus, DeLeo himself remarked, "If the guy was here it'd be so much better." (Transcript at 6A; *see also id.* at 5.) Furthermore, one could reasonably interpret the transcript to reflect that DeLeo had the pecuniary interests of himself and Shields at heart in so advising Cooley. In the same conversation, Cooley and DeLeo discussed at some length the amount of money which should be paid to Shields in exchange for ruling in Cooley's favor, and DeLeo averted to his own expectation that he would share in Cooley's fee at the conclusion of the *Nichols* case. Thus, one might reasonably conclude that DeLeo's interest in seeing Cooley and his client prevail at the forthcoming hearing was grounded not in altruism but a desire to earn the bribes Cooley was willing to pay in exchange for favorable rulings. Under these circumstances, Nixon's interstate travel cannot be deemed merely fortuitous or incidental as a matter of law; rather, it can be viewed as substantially in furtherance of the alleged bribery scheme.[10]

Moreover, there is no question that as an alleged co-conspirator of DeLeo, Shields may be held accountable under the Travel Act for DeLeo's solicitation of the travel. *See United States v. Auerbach*, 913 F.2d 407, 410 & n. 2 (7th Cir.1990); *United States v. Craig*, 573 F.2d 455, 489 (7th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978); *United States v. Peskin*, 527 F.2d 71, 75–76 (7th Cir.1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). Thus, Shields' insistence that all he might possibly have done to affect Nixon's interstate travel was to schedule hearings (Shields Mem. at 10) is misplaced. The Travel Act charge here is not premised upon Shields himself encouraging interstate travel, but rather upon the conduct of his alleged co-conspirator.

In short, the allegations of the indictment, together with the transcript of the August 24 meeting, supply an adequate foundation for the charge that DeLeo actively sought and encouraged Nixon to travel in interstate commerce. Shields, as

---

9. The Seventh Circuit has consistently rejected a scienter requirement that the defendant be aware that interstate travel or use of an interstate facility will take place. *See United States v. Stern*, 858 F.2d 1241, 1247 (7th Cir.1988) (collecting cases). Nonetheless, in light of Shields' contention that Nixon's interstate travel was fortuitous and incidental, it bears pointing out that during the August 24 conversation, Cooley repeatedly stressed to DeLeo that his client was in Washington state; thus, it is more than reasonable to assume that DeLeo realized Nixon would have to cross state lines in order to attend the forthcoming hearing before Shields.

10. As the government correctly observes, a single act of interstate travel is sufficient to support a Travel Act charge, so long as the criminal enterprise which it is intended to further is continuous and not merely an isolated crime. *United States v. Herrera*, 832 F.2d 833, 837 (4th Cir.1987).

DeLeo's alleged co-conspirator, may be held to account for that encouragement. Moreover, because Nixon's attendance at the hearing before Shields was allegedly solicited by the defendants so as to make it easier for Shields to rule in Cooley's favor Nixon's travel may not be discounted as "fortuitous" or "incidental". As DeLeo's own words during the August 24 conversation suggest, the pecuniary gain which DeLeo and Shields allegedly expected to enjoy depended upon Shields being able to dispose of the case favorably.

Finally, it is of little import that a federal agent did the travelling in this case. To the extent the agent's role in perfecting the offense gives rise to concerns about manufacturing federal jurisdiction, this aspect of the case is addressed below. For present purposes, it is enough to note that the interstate acts of federal agents have supplied the key to federal jurisdiction in other cases, with the blessing of the courts. *United States v. Bagnariol*, 665 F.2d 877, 898–99 (9th Cir.1981) (affirming Travel Act conviction based upon interstate telephone call placed by undercover federal agent in response to defendant's message), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Marcello*, 537 F.Supp. 1364, 1374–77 (E.D.La. 1982) (denying motion for judgment of acquittal on Travel Act charges, where evidence showed that although a defendant's secretary had mailed document at instruction of undercover agents, defendants had encouraged the mailing), *judgment aff'd*, 703 F.2d 805 (5th Cir.1983) (per curiam), *cert. denied*, 464 U.S. 935, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983).

■ As noted above, Shields also contends that Count Five must be dismissed because there is no legitimate federal interest in offenses like bribery. *Cf. Altobella*, 442 F.2d at 313 ("the purpose of the Travel Act was to attack criminal activities extending beyond the borders of one state by providing federal assistance in situations in which local law enforcement was ineffective") and *id* at 315 ("there is nothing about the appellants' enterprise ... which suggests any reason why state police powers need to be supplemented by the federal government").[11] This argument fares no better than the others. Although run-of-the-mill bribery may ordinarily constitute a matter within the province of local law enforcement authorities, the taint of corruption in the state judiciary reaches far beyond the borders of Illinois. The Circuit Court of Cook County is the largest consolidated court system in the country, embracing a heavily populated metropolitan area with thousands of national and international businesses. Therefore it would be ludicrous to suggest that the day-to-day decisions of the Cook County judiciary do not have a substantial impact upon interstate commerce. At the same time, as the government argues, the breadth of the Operation Greylord convictions convincingly demonstrates just how ineffective state law enforcement has been in policing the Illinois judiciary and how essential federal intervention has been to expose longstanding corruption within this realm.

Furthermore, whatever merit there might be in the abstract to Shields' contention that use of the Travel Act as a vehicle to ensnare allegedly corrupt Illinois lawyers and judges jeopardizes the delicate balance of federalism, *see Rewis*, 401 U.S. at 812, 91 S.Ct. at 1059, this is a debate in which the Court of Appeals has expressly admonished the district courts not to engage. *See United States v. Podolsky*, 798 F.2d 177, 179–80 (7th Cir.1986). In *Podolsky*, a defendant convicted under the federal arson statute challenged his conviction

---

**11.** *But see United States v. Herrera*, 584 F.2d 1137 (2d Cir.1978), rejecting defendants' contention that they were not subject to the Travel Act because they were not "top men of Organized Crime," did not live far from the house of prostitution they managed, and were not beyond the reach of local authorities:

Anyone who travels across state lines to operate a house of prostitution is susceptible to arrest by local authorities. That does not in any manner alter the fact that such a person may also violate the Travel Act, and no application of "judicial gloss," ... can make New York State and federal jurisdiction mutually exclusive.

*Id.* at 1147.

on the ground that federal undercover agents had "manufactured" federal jurisdiction by steering him toward a target building which possessed the requisite interstate nexus (an argument comparable to Shields' manufacturing argument, which the Court addresses below). The authenticity of the federal interest in the defendant's criminal conduct gave the court some pause: "Admittedly it is not obvious why the federal government's plainclothes police are interested in Chicago firemen who do arson for hire on the side." 798 F.2d at 179; *see also id.* at 179 (noting that the circumstances were "fairly remote" from the concerns which had motivated Congress to enact the federal arson statute). Nonetheless, the court abstained from any effort to pass judgment upon whether or not the federal stake in such conduct was sufficient:

> In any event, having gathered ample evidence that Podolsky was conspiring to burn down a vacant building, the federal agents could have turned the evidence over to the local authorities rather than induce Podolsky to commit a federal crime. The record does not indicate why this was not done, but the reason is not important. The responsibility for wise management of scarce prosecutorial and other governmental resources is not a judicial responsibility. *United States v. Schwartz,* 787 F.2d 257, 266 (7th Cir. 1986); *Rockford League of Women Voters v. NRC,* 679 F.2d 1218, 1222 (7th Cir.1982)....

798 F.2d at 179. The government construes *Podolsky* as "direct[ing] courts to get out of the business of reviewing prosecutive decisions on whether a matter is best handled by local instead of federal prosecutors." (Gov.Mem. at 18.) This is a bit bluntly put, perhaps, but nonetheless an essentially accurate summary of *Podolsky*'s missive. Certainly where, as in this case, it is reasonable to conclude that the type of conduct charged might well have substantial interstate ramifications and at the same time escape the reach of local law enforcement, *cf. Podolsky,* 798 F.2d at 179 (noting the complexity and multijurisdictional nature of arson and the difficulties

of prosecuting at state level), a court need not search further in order to justify the federal intrusion into state affairs.

## B. *Manufactured Jurisdiction*

█ Building upon his contention that interstate travel became inevitable during the life of the *Nichols* litigation once the government decided to employ an out-of-state agent to play the role of the plaintiff, Shields maintains that the government has manufactured federal jurisdiction. In Shields' words:

> [I]t was the government's sole decision to assign Nixon, an out-of-state agent, to play the role of the Illinois plaintiff in *Nichols.* The government also fabricated the fiction regarding the plaintiff's business trip and his inability, as a result of the business trip, to appear at the August 29, 1988 hearing. Then, knowing that Nixon's travel was all but inevitable, it attempted through conversations with Shields and DeLeo to "manufacture" a basis to argue that Shields and DeLeo "caused" and "actively encouraged" this travel in order to establish the jurisdictional element of § 1952.

(Shields Mem. at 11.) In support of his argument, Shields relies upon *United States v. Archer,* 486 F.2d 670, 682 (2d Cir.1973) (Friendly, J.), in which the Second Circuit reversed the defendants' Travel Act convictions based upon a record which indicated that the "the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." The convictions in *Archer* resulted from a federal investigation into suspected corruption and bribery within the New York City criminal justice system. The Travel Act convictions were premised upon three telephone calls, two of which were interstate and the third international. The court found each insufficient to supply federal jurisdiction: One had been placed by a defendant to an agent who admitted he had crossed state lines into New Jersey solely in order to force an interstate telephone call, *id.* at 681; the second was a call which a defendant had attempted in vain to make to an agent in Nevada based upon misinformation planted

by the agents, *id.* at 682; and the third was placed to a defendant from an agent while the agent was abroad in Paris working on an unrelated investigation, *id.* at 682–83. These facts lead the court to conclude that the government's case was one of "[m]anufactured jurisdiction." *Id.* at 682. On rehearing, the court emphasized that the particular circumstances of the case did not satisfy the stricter standard of scrutiny it found applicable when jurisdiction under the Travel Act was supplied solely by the acts of federal agents. *Id.* at 685–86; *see United States v. Herrera,* 584 F.2d 1137, 1146 (2d Cir.1978). Shields contends that the government has engaged in comparable efforts to manufacture federal jurisdiction in this case, purposely choosing an out-of-state agent whose inevitable trips to Illinois would supply the interstate travel needed to pin federal charges upon the defendants.

The government responds that "[a]t best for defendants, *Archer* is in some sort of deep sleep from which it is never disturbed." (Gov.Mem. at 19) (footnote omitted). To the extent the decision has any continuing vitality, the government argues, it is limited to instances in which the government stages interstate activity for the sole purpose of creating federal jurisdiction; but interstate conduct which fits reasonably within an undercover scenario is an acceptable basis for a Travel Act charge. In this case, the government contends, the use of out-of-state agents is explained by security concerns rather than by an intent to manufacture jurisdiction: using local agents posed a substantial risk in that they would have to appear in crowded public courtrooms where they might be identified. Moreover, Nixon was a logical choice in that he had prior experience in another operation which provided him with expertise regarding the type of investment partnership crafted as the basis for the *Nichols v. Wilson* suit. Finally, the government reiterates that the circumstances belie the contention that the government intended to use Nixon's Washington residence as a means to secure a Travel Act charge in this case. The government points out that the Title III

application it submitted to the acting Chief Judge on August 29, 1988, did not list the Travel Act as one of the offenses for which it sought evidence. (*See* Application for an Order Authorizing the Interception of Oral Communications, Aug. 29, 1988, at 1–2 ¶ C.) The basis for a Travel Act charge was created, the government argues, only when DeLeo repeatedly pressed a reluctant Cooley to have his client return to Illinois for the second hearing before Shields, and this was entirely the work of DeLeo, not the government.

As the government has represented, *Archer's* subsequent case history has been one characterized by the universal effort of other courts to distinguish, rather than follow, the opinion. Thus, the Seventh Circuit remarked in *Podolsky, supra,* "Although *Archer* was decided 13 years ago, no conviction has ever been set aside on the sole basis of the principle announced by it, even in the Second Circuit." 798 F.2d at 180; *see also id.* at 180, 181 (collecting cases which have distinguished *Archer*). That *Archer* stands alone in application of the "manufactured jurisdiction" rationale is explained by the extent of the governmental overreaching in that case, as other courts have repeatedly noted. *See, e.g., United States v. Anderson,* 809 F.2d 1281, 1288 (7th Cir.1987) ("this case does not reflect the sort of labored pretense found in *Archer*"); *Podolsky,* 798 F.2d at 181 ("we are not the only court to have described [*Archer*] as a case of virtual entrapment"); *United States v. Bucey,* 691 F.Supp. 1077, 1078 (N.D.Ill.1988) (Williams, J.) ("[t]he facts in *Archer* showed an extraordinarily overzealous effort by the government agents"). The pervasive reluctance of the courts to follow *Archer* led the Seventh Circuit in *Podolsky* to question whether the case retained any precedential force:

> The course of decisions casts doubt if not on the result in *Archer* then on the vitality of the independent principle announced there that forbids the "manufacture" of federal jurisdiction in circumstances not constituting entrapment and not canceling any element of the crime such as criminal intent.

798 F.2d at 181. Indeed, the court explicitly suggested that in circumstances where the government's conduct does not rise to the level of entrapment and where the elements of the federal charge are otherwise present, only a charge of outrageous governmental conduct might remain available to the defendant. *Id.; accord United States v. Petit,* 841 F.2d 1546, 1553–54 (11th Cir.1988).

The current record does not compel the dismissal of Count Five upon any of the grounds discussed in *Podolsky.* The facts here are a far cry from *Archer.* Although the government did employ out-of-state agents, the reasons it has proffered for doing so are not implausible and the circumstances do not suggest that they were merely invented on a *post hoc* basis in order to disguise overzealousness. *Cf. Bagnariol, supra,* 665 F.2d at 898 (rejecting *Archer* challenge where the interstate telephone call supplying Travel Act jurisdiction was made by defendant to undercover agent who resided in another state; court concluded that agent's residence was not established in that state solely for purposes of manufacturing jurisdiction); *United States v. Moore,* 735 F.Supp. 902, 903 (N.D.Ill.1990) (Lindberg, J.) (although evidence indicated that major, if not primary, reason for basing undercover operation in Indiana was to obtain federal jurisdiction over truck thefts occurring in Chicago area, dismissal was not required under *Archer* where Indiana site also supplied a better cover story for agent).[12] Moreover, as the Court has explained above, the dialogue between Cooley and DeLeo on August 24, 1988, reasonably may be read to support the government's position that it was DeLeo who encouraged and initiated Nixon's interstate travel to attend the August 30 hearing before Shields, for the evident purpose of making it easier for Shields to rule as Cooley wished. The government may have rendered a Travel Act charge possible by employing an out-of-state agent who would likely travel across state lines at some point during the course of the undercover investigation, but the evidence tends to indicate that it was DeLeo, not the government, who encouraged the particular instance of travel which underlies Count Five. The circumstances of the case therefore satisfy even the "stricter standard" the *Archer* court believed applicable when a federal agent himself or herself engages in the interstate activity. *See* 486 F.2d at 685–86. Next, Shields makes no suggestion that the government's conduct negated an element of the offense.[13] Nor is any entrapment evident from the August 24 encounter be-

12. After its initial review of the briefing on Shields' motion to dismiss the Travel Act, the Court asked the government to submit *in camera* and *ex parte* an affidavit detailing the circumstances of its decision to utilize out-of-state agents. The government has submitted the affidavit of FBI Special Agent John S. Bowen, whose responsibility it was to assign agents to roles in the *Nichols v. Wilson* litigation. This affidavit tends to confirm the rationale the government has articulated in its memorandum as justification for the selection of Nixon. It also echoes the government's disclaimer of any prior plan to have Nixon travel to Chicago for the second hearing before Shields, and asserts that arrangements for Nixon to attend the hearing on August 30, 1988, were made only after DeLeo repeatedly urged Cooley to have his client present. Bowen's affidavit has been made part of the record under seal.

DeLeo has suggested that there may be a need for an evidentiary hearing upon the security concerns which purportedly motivated the government to employ out-of-state agents in this investigation. (DeLeo Partial Additional Pretrial Motions at 13.) There would be little point in holding such a hearing. The type of evidence which the government would proffer at such a hearing is evident from its memorandum and the foregoing summary of Bowen's affidavit. The Court may also assume that the defense would elicit evidence "that in the Chicago area there are several hundred FBI agents, [and] that the FBI maintain[s] offices staffed by FBI agents in several suburbs...." (*Id.*) Nonetheless, the government's security rationale represents common sense, and it is unlikely that the defendants' evidence would reveal that rationale to be "specious" as DeLeo suggests. (*See id.*) In any event, given the evidence tending to show that DeLeo of his own volition actively encouraged Nixon's interstate travel, the government's reasons for selecting an out-of-state agent are not particularly important.

13. The transcript of the conversation between Cooley and DeLeo makes it difficult to argue, for example, that DeLeo had no idea he was encouraging Cooley to have Nixon cross state lines or that the travel was for purposes of furthering the alleged course of bribery.

tween Cooley and DeLeo. Indeed, it would be difficult even to describe this as an instance of DeLeo "taking the bait," for Cooley repeatedly expressed his reluctance to disrupt his client's business in Washington and wondered aloud whether there might be a way to avoid bringing him in for the hearing.[14] Finally, there is no hint of outrageous governmental conduct here. Such a claim would be extraordinarily difficult to make in any circumstance. *See United States v. Miller*, 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring) ("Our court has never reversed a conviction on the basis of this defense and has questioned language looking favorably on it. When push comes to shove, we should reject the contention that the criminal must go free because the constable was too zealous. Why raise false hopes?") (citations omitted); *Podolsky*, 798 F.2d at 181. For the reasons already stated, even assuming that a claim of outrageous governmental conduct remains cognizable in this circuit, the facts do not support invocation of the doctrine here.

To the extent the circumstances in this case might offend some sensibilities, the facts and holding of *Podolsky* merit further discussion. As the Court noted earlier, the defendant in that case was caught in a sting operation and charged with arson. In the course of their undercover operation, federal agents realized that the building the defendant was planning to burn lacked attributes such as rental units or a connection to an interstate natural gas line which would render the conspiracy to burn it within the reach of the federal arson statute. To cure this defect, agents steered the defendant toward an adjacent building which had the requisite federal nexus. The defendant moved for dismissal of the charge, relying upon *Archer*. Judge Aspen denied the motion, stressing that whatever the government had done to fos-

ter federal jurisdiction, the defendant himself had willingly agreed to take the crucial step:

> [T]he defendant in *Archer* neither agreed to do nor did anything with interstate consequences; the federal officials did it all. In contrast, Podolsky himself agreed to do acts with interstate consequences. He agreed with Hawkins to burn the 2438 building. Although federal agents set this additional plot in motion, Podolsky willingly carried the plot along. There was an agreement *by the defendant* not merely to commit a local crime of arson, but to burn a building which falls under the wide umbrella of 18 U.S.C. § 844(i).

*United States v. Podolsky*, 625 F.Supp. 188, 194 (N.D.Ill.1985) (emphasis in original) (footnote omitted). The court of appeals affirmed Podolsky's conviction, concluding that the government's conduct supported neither a claim of entrapment, 798 F.2d at 179–80, nor one of outrageous governmental conduct, *id.* at 181. With respect to the latter claim, the court reiterated its admonition that the courts should not weigh the merits of federal indictments arising from criminal activity which could have been left to local authorities:

> The decision to steer Podolsky to number 2438 rather than to hand him over to the Chicago police may or may not have been a wise exercise of administrative discretion, but the federal courts do not review the exercise of such discretion unless it is based on invidious grounds, for example race. The remedies for wasting the federal taxpayer's money on investigatory and prosecutorial activities better left to the cities and states are political rather than judicial; all other objections to an aggressive judicial role in this area to one side, judges lack the information nec-

---

**14.** The most it would seem the defendants could argue is that the government effectively "forced" DeLeo to request Nixon's presence by (1) arranging to have Nixon outside of Illinois on the date set for the second hearing before Shields, (2) knowing that DeLeo and Shields were likely to want Nixon present for that hearing so that ruling in Cooley's favor would be simpler, and (3) instructing Cooley to feign reluctance to bring his client in until DeLeo all but instructed him to do so. The plausibility of such a scenario aside, it plainly relies upon significant assumptions in which it would be inappropriate for the Court to indulge upon a motion to dismiss.

essary to evaluate prosecutorial decisions in areas of concurrent federal and state criminal jurisdiction.

*Id.* (citations omitted). The circumstances here are far less compelling than they were in *Podolsky*. There presently is no evidence that the government tricked the defendants into soliciting the interstate travel. Rather, the allegations of the indictment, as fleshed out by the tape recording and transcript of the August 24 meeting between Cooley and DeLeo, lend ample support to the government's claim that DeLeo himself actively encouraged Agent Nixon's trip to Illinois in order to facilitate the alleged scheme to throw the *Nichols* case in Cooley's favor in exchange for bribes. That the government made the interstate travel possible by choosing Nixon to play the role of Nichols does not matter under *Podolsky*, for one may reasonably conclude that it was the defendants' own acts which ultimately prompted the travel to occur.

### III. CONCLUSION

For the reasons set forth above, Shields' motion to dismiss Count Five of the superseding indictment is denied. DeLeo's motion to dismiss is denied on the same grounds.