In the

# United States Court of Appeals
## For the Seventh Circuit

No. 09-4116

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROBERT MANDEL,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 997—**William J. Hibbler**, *Judge*.

ARGUED OCTOBER 19, 2010—DECIDED JULY 28, 2011

Before CUDAHY and ROVNER, *Circuit Judges*, and
ADELMAN, *District Judge*.[*]

ROVNER, *Circuit Judge*.  When Robert Mandel decided
to have his business partner killed, he turned to Patrick
Dwyer, a trusted friend and employee of the business,
for help in finding a killer. Dwyer instead went to the
authorities, was outfitted with a wire, and proceeded to

[*] The Honorable Lynn S. Adelman, of the Eastern District
of Wisconsin, sitting by designation.

record a series of conversations in which he and Mandel plotted the details of the murder in person and over the telephone. A jury later convicted Mandel on multiple charges that he used facilities of interstate commerce—namely, a cellular telephone and his car—in furtherance of a murder for hire scheme, in violation of 18 U.S.C. § 1958(a). Mandel appeals, contending that he was entrapped into discussing the murder on a cell phone, so as to manufacture federal jurisdiction over an otherwise local offense, and that his purely intrastate use of an automobile does not constitute the use of an facility of interstate commerce. We affirm.

**I.**

Mandel and Konstantinos "Gus" Antoniou each owned a 50-percent share in G&D Excavating Company, a firm that engaged in sewer and water work and trucking in addition to excavations. Disagreements over the company's finances and equipment caused their friendship as well as their partnership to erode. As of April 2008, the two men were in litigation over the company's property. As of the following October, Antoniou had locked Mandel out of the company's premises.

In late August 2008, members of the Chicago police and the Federal Bureau of Investigation's armed violence task force learned from Dwyer that Mandel had discussed the possibility of hiring someone to murder Antoniou. According to Dwyer, Mandel had said he knew an unidentified individual who wanted Antoniou killed and had asked Dwyer to find a hit man and deter-

mine how much it would cost. Mandel reportedly offered to provide Dwyer with a gun, if needed.

Dwyer agreed to help the authorities investigate the murder for hire scheme. He proceeded to engage Mandel in a number of covertly recorded conversations, both in person and on the telephone, in which the two men laid out plans to engage a hit man to commit Antoniou's murder. These conversations would later form the basis for federal charges against Mandel.

On August 28, Mandel met Dwyer at a job site on the south side of Chicago where Dwyer was working. The two men then went for a drive in Mandel's car to inspect another job site. While en route and upon arrival at the site, the two of them discussed the murder. Dwyer had informed Mandel by telephone the day before that he had located someone who was willing to kill Antoniou. Mandel now confirmed to Dwyer that the unnamed third party, along with a second unidentified person, still wanted Antoniou killed—purportedly because he had cheated them out of $85,000—but not until November. When Dwyer remarked that the hit man might not be able to procure a gun on his own, Mandel assured Dwyer that this would not be a problem. "Oh I can get a gun," he assured Dwyer. "I'll get it from . . . Indiana." Gov. Ex. Aug. 28, 2008 Tr. 1. Mandel suggested that when the time came, the hit man should lay in wait for Antoniou at his home, to which he typically returned in the late evening or early morning hours. Mandel offered to drive Dwyer past the house to show him the layout. As for the hit man's fee, Dwyer advised Mandel

that he had talked the hit man down to five thousand dollars from ten. Mandel agreed with Dwyer's request that the third parties who were commissioning the murder be asked to pay six thousand dollars. "Leave somethin' for us, yeah." *Id.* at 13. When Dwyer inquired who else knew about the plan, and expressed concern that neither he nor Mandel be identified as complicit, Mandel repeatedly assured Dwyer that he had told no one. "Nobody knows," he told Dwyer. "Me and you." *Id.* at 2. Mandel had driven to this meeting in his automobile, a 2004 Mercury Marauder. His use of the car in furtherance of the scheme formed the basis for Count One of the indictment. The vanity license plate on the Mercury Marauder bore the apt legend, "NoHalo." Truth bests fiction once again.

Dwyer contacted Mandel on Mandel's cell phone on September 10, 2008. When Dwyer inquired whether Mandel had spoken with "them people yet," Mandel advised him that they were arriving in town on the following day and that he expected to speak with them within a day or two after that. Gov. Ex. Sept. 10, 2008 Tr. 1. The conversation then turned to the hit man's payment. Dwyer suggested that Mandel ask the third parties for money so that the hit man could be given some portion of his fee up front. Mandel rejected the idea. "Ah here's the story[.] I'm not gonna give him any money. Here's what I wanna do is. I want to have all the money in my hand [and] show it to you and he can see it to[o]." *Id.* at 2. "When he's done we'll give it to him," Mandel told Dwyer. *Id.* Mandel's use of his cell phone to conduct this discussion of the murder for

hire scheme formed the basis for Count Two of the indictment.

One week later, Dwyer spoke with Mandel, again via Mandel's cell phone. Dwyer placed the initial call to Mandel but did not reach him; Mandel subsequently returned Dwyer's call. When Dwyer asked him whether "that thing [is] still gonna happen," Gov. Ex. Sept. 10, 2008 Tr. 1, Mandel assured him that it would. "Yes, it is. Yes, it is. You gotta . . . it'll happen soon." *Id.* "I would say in a week or so," he added. *Id.* Dwyer told Mandel that they would have to get together so that Mandel could "show me that house and that again," to which Mandel responded "Okay." *Id.* But when Dwyer then asked Mandel to "get that thing for me from Indiana," *id.*, an apparent reference to a gun for the hit man, Mandel questioned whether it was necessary. "I thought he had his own tools." *Id.* at 2. Dwyer said he would ask the hit man. This telephone call formed the basis for Count Three of the indictment.

Delay set in (Mandel advised Dwyer that his principals were not returning his calls), and when Dwyer and Mandel spoke by phone on October 22, 2008, Mandel said that he was now "working on something of my own." Gov. Ex. Oct. 22, 2008 Tr. 2. "It took me a little while but I got some things going," he told Dwyer. *Id.*

Mandel met Dwyer in the parking lot of a Des Plaines restaurant/bar on November 7. Mandel announced that he was ready to proceed with the murder without the support of the third parties on whose behalf he had been acting previously. "I'm ready to do it myself," he

announced. Gov. Ex. Nov. 7, 2008 Tr. 1. "[T]hey won't give me the money." *Id.* When Mandel asked Dwyer to remind him how much the hit man wanted, Dwyer told him five thousand dollars but suggested that he (Dwyer) might unilaterally cut that price in half and pay the hit man out of his own pocket. Mandel responded that he would "like to give him some money too" because "[i]t would make my life easier too because then I'd own all of G and D." *Id.* at 8. Mandel disclaimed any worry that he would be fingered for the hit, reasoning that he was only one of many people who wanted Antoniou dead. "[T]here's too many other people that have more to gain than I do," he observed. *Id.* at 10. "Too many people have already fuckin' threatened him." *Id.* at 12. When Dwyer inquired of Mandel, "Well I mean should I just send him to do it?" Mandel responded, "Yeah, I'll come over, show you exactly where everything is . . ." *Id.* at 10-11. Mandel then told Dwyer that he could help himself to some of G&D's equipment once the murder had been accomplished.

> Mandel: Well get him done and I'll give 'em to ya. I'll give you so much shit back there you're gonna have to find a . . .
>
> Dwyer: If I get rid of him.
>
> Mandel: Get 'em.
>
> Dwyer: If I get rid of him. I'll, I'll get all the shit out a there.
>
> Mandel: I'll get you as much as I can.

*Id.* at 11. As the meeting began to wind down, Dwyer asked Mandel where Antoniou typically could be found.

Mandel reiterated, "The house is the best place. He never comes home 'til two in the morning. . . . Three in the morning." *Id.* at 14-15. Dwyer concluded the meeting by urging Mandel to "get that done." *Id.* at 15. Mandel responded, "I'm in." *Id.* at 16. Mandel promised Dwyer that he would be reimbursed for the hit eventually. "You can get it done, and pay for it later. I'll get it done," he assured Dwyer. *Id.*

Later that month, on November 25, Mandel drove Dwyer past Antoniou's home and discussed the logistics of the murder.[1] Mandel suggested that when Antoniou arrived home in his car, the hit man should approach the car and kill Antoniou before he could exit the vehicle. "I'd go right up to his car, shoot him right in the door. Don't even let him get out of it." Gov. Ex. Nov. 25, 2008 Tr. 20. "I'd come around the front of the house, not through the back, 'cause he'll see you comin', then he can back out. Come around the front, walk up to the drive-

---

[1] There were actually two homes associated with Antoniou that Mandel and Dwyer drove past on November 25: one where Antoniou's mother and her caretaker resided, and another where his girlfriend, their two children, and her two children from a prior relationship resided. Antoniou spent most of his time at the second of these two homes, and it is at that residence that Mandel suggested he be murdered. Antoniou would later testify that on most evenings he would pick up his mother from the first residence between 9 and 11 p.m. and take her to a late dinner. After he returned his mother to her home, he would then drive to the other residence for the night, typically arriving there between 11:30 p.m. and 1:00 a.m.

way, and talk to him." *Id.* at 21. Antoniou was expected to have his son with him for visitation during the up-coming Thanksgiving weekend, and because Antoniou's girlfriend would not allow the son in her house, Antoniou was expected to stay at his mother's home for the duration of the visitation. So, during this meeting, in order to determine when Antoniou would be returning to his usual residence, Mandel telephoned a third party on his cell phone to determine when Antoniou would return the boy to Antoniou's ex-wife. That call formed the basis for Count Five of the indictment. The overall encounter between Mandel and Dwyer, and Mandel's use of a car in connection with it, formed the basis for Count Six.

On the evening of December 3-4, 2008, Dwyer made a series of three phone calls to Mandel, ostensibly to report on the hit man's status, although no murder was in fact occurring. Dwyer made the calls from the Chicago office of the FBI. In the first of the three calls, Dwyer informed Mandel that the hit was "gonna happen today" and that "[m]y guy's there, right now." Gov. Ex. Dec. 3, 2008 Tr. 1-2. In the second call, which took place just after midnight, Dwyer asked Mandel if he knew when Antoniou might be returning home. Mandel advised him, "Probably around twelve or one o'clock . . . ." Gov. Ex. Dec. 4, 2008 12:01 a.m. Tr. 1. This telephone call formed the basis for the final count of the indictment against Mandel, Count Seven. Finally, more than four hours later, at 4:28 a.m., Dwyer telephoned Mandel to apprise him, "Hey Bobby, that's done." Gov. Ex. Dec. 4, 2008 4:28 a.m. Tr. 1. To which Mandel responded, "Ooohh . . . ."

*Id.* Mandel advised Dwyer that they would speak later. Mandel was arrested a short time later at his apartment.

Mandel testified in his own behalf at trial. He denied that he ever asked Dwyer to have Antoniou killed or that he had any intent to kill Antoniou; it was Dwyer, Mandel testified, who first raised the idea and there-after kept pushing it on him. Mandel did not dispute that he had had the recorded conversations with Dwyer, and he admitted that when Dwyer first told him in July or August 2008 that he (Dwyer) knew people who could kill Antoniou, "I probably said, that would be nice, you know, but that's as far as it went." Tr. 299. Mandel maintained that although the tapes made it seem that he was going along with the plan to murder Antoniou, it was actually his intent to stall Dwyer. "I said all them things on the tapes. But there is other tapes they didn't see that I tried to cool it down, yes, tried to stop him." Tr. 300. Mandel explained that the two people he told Dwyer he was working with did not really exist. "I never had nobody. That was just an excuse to say, they didn't want to do it. They changed their mind. But [Dwyer] would never take that for an answer." Tr. 304. When his attorney asked him why he didn't just tell Dwyer no, Mandel responded, "I'm stupid. I—he just pushed. He just was calling me all the time." Tr. 304. Mandel said that he did not think that Dwyer would actually have Antoniou killed.

Mandel also presented testimony from a defense in-vestigator that, based on her review of records related to Dwyer's cell phone number, Dwyer called Mandel a total

of thirty-one times from July 26 through August 26, 2008 (after which time the covertly monitored phone calls and meetings between the two commenced), whereas Mandel called Dwyer only five times during the same period (excluding certain discrepancies). In rebuttal, the government introduced records associated with Mandel's phone for five dates in August, 2008 when Dwyer and Mandel had multiple telephone contacts. Those records showed that on each of those dates, it was Mandel who initiated the first call between himself and Dwyer.

At the end of the government's case, the district court dismissed Count Four of the indictment, which was based on an unrecorded telephone call to set up the meeting on the following day, November 25, when Dwyer and Mandel drove by Antoniou's home. At the conclusion of the case, the jury convicted Mandel on each of the remaining six counts of the indictment. The district court subsequently denied Mandel's post-trial motions for a judgment of acquittal and for a new trial. On December 2, 2009, the court ordered Mandel to serve a prison term of 138 months.

## II.

A.  Entrapment into Using Facility of Interstate Commerce

Mandel was charged under the federal murder for hire statute, which in relevant part prohibits the use of a facility of interstate commerce with intent that a murder be committed in exchange for money or other things of value. § 1958(a). Counts Two, Three, Five, and

Seven of the indictment charged that Mandel used his cell phone in furtherance of the scheme to have a hit man kill Antoniou (named in the indictment as Individual A). *See United States v. Evans*, 476 F.3d 1176, 1180 (11th Cir. 2007) (telephones and cellular telephones are in-strumentalities of interstate commerce)[2]; *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997) (cellular telephones are instrumentalities of interstate commerce); *United States v. Richeson*, 338 F.3d 653, 660 (7th Cir. 2003) (use of telephone lines constitutes use of facility of interstate commerce for purposes of section 1958(a), even when telephone calls themselves are intrastate). Counts One and Six charged that he used his automobile in furtherance of the scheme. *See United States v. Cobb*, 144 F.3d 319, 322 (4th Cir. 1998) (automobiles qualify as instrumentalities of interstate commerce).

Mandel challenges his conviction on three counts of the indictment (Counts Two, Three, and Seven) which were based on his use of a cellular telephone in furtherance of the murder for hire scheme. At this point, he no longer contests the sufficiency of the evidence estab-lishing his intent to have Antoniou killed. But what section 1958 prohibits is the use of a facility of interstate commerce—in these counts, the cell phone—with the intent to commit a murder for hire. It is the use of a facility

---

[2] For present purposes, the terms "facility of interstate com-merce," as used in section 1958, and "instrumentality of inter-state commerce," as used in case law concerning the Commerce Clause, *e.g., United States v. Lopez*, 514 U.S. 549, 558, 115 S. Ct. 1624, 1629 (1995), are essentially interchangeable. *See United States v. Marek*, 238 F.3d 310, 317 n. 26 (5th Cir. 2001) (en banc).

of interstate commerce which transforms what would otherwise be a state offense (murder for hire) into one that is within the federal government's authority under the Commerce Clause to proscribe and prosecute. *See* Const. art. I, § 8, cl. 3; *United States v. Lopez*, 514 U.S. 549, 561-62, 115 S. Ct. 1624, 1631 (1995). Mandel contends that he was not predisposed to use a cell phone to discuss the details of the murder for hire scheme with Dwyer but rather was entrapped into doing so by Dwyer, who initiated the telephone calls underlying Counts Two, Three, and Seven by contacting Mandel on his cell phone. (With respect to the calls underlying Counts Two and Seven, Mandel answered his phone when Dwyer called. As for the call underlying Count Three, Mandel returned Dwyer's call.) In his attorney's words:

> At best, the government can argue that Mr. Mandel was predisposed to plot against Antoniou, a contention Mr. Mandel strenuously opposes. But even accepting the government's contention, there is no evidence that he was predisposed to pick up his cellular phone and call Dwyer in furtherance of that plot. The government cannot equate a predisposition to commit murder for hire with a predisposition to use a facility of interstate commerce in furtherance of that murder for hire. Not when that use of a facility of interstate commerce, on that particular occasion, constitutes a distinct crime. Even were Mr. Mandel predisposed to plot against Antoniou, it is pure conjecture that he would ever place a call to Dwyer in connection with that plot, much less that he would do so on three separate occasions.

Mandel Brief 9. We note that Mandel does not challenge his conviction on Count Five, which was premised on the cell phone call that he himself initiated to a third party on November 25 to determine when Antoniou would be returning his son to his ex-wife. *See* Mandel Br. 5. Mandel concedes implicitly as to that count that neither his use of the cell phone to make the charged call nor his discussion of matters related to the murder for hire were induced by the government.

As we have noted, the district court denied Mandel's motion for a judgment of acquittal, and we review that ruling de novo. *E.g.*, *United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1713 (2011). We consider, as the district court did, whether the record contained sufficient evidence from which a rational jury could find the defendant guilty beyond a reasonable doubt. *E.g.*, *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011). In making that assessment, we examine the evidence in the light most favorable to the government, having in mind that it was the jury's job to gauge the credibility of the witnesses and to decide what inferences to draw from the evidence. *Id.*; *Tavarez*, 626 F.3d at 906.

In order to prove a defendant guilty of violating section 1958(a) based on the use of a facility of interstate commerce, the government must show that (1) the defendant knowingly used or caused another to use a facility of interstate commerce, (2) the facility of interstate commerce was used with the intent that a murder be committed in violation of state law, and (3) something of pecuniary value was promised or agreed to be paid in consideration for the murder. *United States v. Preacher*,

631 F.3d 1201, 1203 (11th Cir. 2011); *United States v. Acierno*, 579 F.3d 694, 699 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1567 (2010); *United States v. Robertson*, 473 F.3d 1289, 1292 (10th Cir. 2007); R. 49 at 17 (district court's jury instruction).

A defendant is entrapped when he (1) lacks the predisposition to commit a crime, and (2) is induced by the government to engage in the offense. *See, e.g., United States v. King*, 627 F.3d 641, 650 (7th Cir. 2010). Whether the defendant is predisposed to commit the charged crime depends on a number of factors, *see, e.g., United States v. Orr*, 622 F.3d 864, 870 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 2889 (2011), "the most important of which is 'whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement.'" *King*, 627 F.3d at 650 (quoting *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999)). Inducement must be extraordinary to establish entrapment, "the sort of promise that would blind the ordinary person to his legal duties." *United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006) (quoting *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991)). "If a person takes advantage of a simple, ordinary opportunity to commit a crime—'not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person'—then the person is not entrapped." *Id.* (quoting *Evans*, 924 F.2d at 717).

One preliminary point bears noting before we address the merits of Mandel's challenge. The entrapment argument that Mandel is making now is different from the one he made below. At trial, Mandel's contention was

that he had no predisposition to kill Antoniou and that Dwyer, on the government's behalf, induced him to join in a (fictitious) plot that Dwyer himself had concocted and repeatedly pressed on Mandel. *See, e.g.*, R. 82 at 31, 35-36; R. 83 at 242; R. 85 at 438-39, 443-45, 452. Nowhere in the record below do we find a contention that Mandel was entrapped into using his cell phone in furtherance of that plot. However, because the government does not contend that Mandel forfeited the particular entrapment argument he is making now by not making the same argument below, we shall proceed to the merits. *See United States v. Smith*, 618 F.3d 657, 663 (7th Cir. 2010); *United States v. Leichtnam*, 948 F.2d 370, 375 (7th Cir. 1991).

The evidence presented to the jury was more than sufficient to dispel the notion that Mandel was entrapped into using his cell phone in furtherance of the scheme to murder Antoniou. Granted, Dwyer invited Mandel to use a facility of interstate commerce in connection with the murder plot by placing calls to Mandel's cell phone in order to discuss that subject. But, as is so often the case when entrapment is claimed, Dwyer, on the government's behalf, simply provided Mandel with an opportunity to commit a criminal act that Mandel accepted without any real inducement, let alone one strong enough to support an inference of entrapment. Mandel posits that he would not have discussed the murder scheme on a cell phone but for Dwyer taking the initiative in contacting him on his cell, but the evidence suggests otherwise. First, the cell phone was Mandel's own phone, and although use of such telephones was rare thirty years ago, it is commonplace

today—in both law-abiding and criminal domains. Second, Mandel took Dwyer's calls (and, as the call underlying Count Three demonstrates, returned them) and readily discussed the scheme to kill Antoniou without any apparent reluctance or hesitation. Third, Mandel was not simply a passive recipient of the calls. The call underlying Count Five is one that Mandel himself placed to someone other than Dwyer in order to determine when Antoniou's visitation with his son would be ending and Antoniou would be returning to his usual abode, so that an appropriate date for the hit could be determined. Mandel's self-initiated use of his cell phone in that instance puts the lie to the notion that he would not have used the phone in furtherance of the scheme but for Dwyer's prompting. Finally, to the extent that Dwyer's calls to Mandel's cell phone could be characterized as inducement to use that phone to discuss the scheme, they were hardly the sort of extraordinary inducement that is necessary to show entrapment. *See United States v. Podolsky*, 798 F.2d 177, 179-80, 181 (7th Cir. 1986); *United States v. Gardner*, 516 F.2d 334, 344-45 (7th Cir. 1975). All that Dwyer had to do to get Mandel to use a facility of interstate commerce in furtherance of the scheme was to invite that use by placing calls to Mandel's cell phone and raising the subject of Antoniou's demise. Mandel accepted the invitation without hesitation. The district court remarked that the evidence that Mandel was entrapped into plotting Antoniou's murder was "scant at best," R. 62 at 1, and that is even more true of the assertion that he was entrapped into using a facility of interstate commerce in furtherance of the plot.

Mandel is left to rely on the notion that the government improperly "manufactured jurisdiction" over his conduct by having Dwyer initiate calls to Mandel's cell phone in order to ensure Mandel's use of a facility of interstate commerce and thus to establish a key element of the federal offense. *See United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). The Second Circuit in *Archer* reversed the defendants' convictions under the Travel Act, 18 U.S.C. § 1952, where the evidence disclosed that a federal agent had crossed state lines to place a telephone call to one of the defendants (which the defendant then returned) "for the precise purpose of transforming a local bribery offense into a federal crime." 486 F.2d at 681. *See also United States v. Coates*, 949 F.2d 104 (4th Cir. 1991). The *Archer* decision presupposes that it is improper for a government agent to initiate some action in interstate commerce for the sole purpose of ginning up federal jurisdiction over an offense, even if, as in *Archer*, the defendant himself willingly reciprocates the agent's interstate action.

But as Mandel acknowledges, this Circuit has declined to embrace *Archer*'s broad proscription against manufactured jurisdiction. We have been skeptical of the contention that the government "manufactures" jurisdiction simply because its agent invites the defendant to take some action in or affecting interstate commerce and the defendant accepts that invitation. We pointed out in *Podolsky* that the defendant in *Archer* "knew when he returned [the agent's] phone call he was making an interstate phone call and one related to the corrupt practices for which he and Archer were later prosecuted, so

there could be no argument that [the defendant] lacked criminal knowledge or predisposition." 798 F.2d at 181. We added, thirteen years after the *Archer* decision, that "no conviction has ever been set aside on the sole basis of the principle announced by it, even in the Second Circuit." *Id.* at 180. The same was still true more than thirty years after *Archer* was decided. *United States v. Skoczen*, 405 F.3d 537, 543 (7th Cir. 2005) ("No case has ever turned on the principle set forth in *Archer*."). Only where the actions of the government amount to entrapment have we been willing to recognize an *Archer*-like challenge to the conviction. *See Gardner*, 516 F.2d at 345 (construing *Archer*'s holding as one based on entrapment: "The essence of [*Archer*'s] holding is that the defendants were not merely taking advantage of an opportunity to complete their scheme provided by the Government, and that they were not predisposed to make the telephone calls."); *Podolsky*, 798 F.2d at 181 (noting that post-*Archer* cases cast doubt on any "independent principle . . . that forbids the 'manufacture' of federal jurisdiction in circumstances not constituting entrapment and not canceling any element of the crime such as criminal intent"); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) (reading *Podolsky* as holding that "*Archer* has no force unless the agents' acts amount to entrapment").

Mandel's resort to *Archer* consequently fails, because as we have already discussed, he was not entrapped into using a facility of interstate commerce to discuss the murder for hire. At most, the government, through Dwyer, merely presented Mandel with the opportunity

to use his own cell phone to plan the murder, which
Mandel readily did with no extraordinary inducement
by Dwyer.[3]

B.  Intrastate Use of Automobile

Counts One and Six were based on Mandel's use of an
automobile in furtherance of the murder for hire
scheme. Count One was based on the encounter of

---

[3] For these and additional reasons, we find no merit to Mandel's
complaint that the government had the ability to lengthen his
sentence by initiating multiple telephone calls, thereby manu-
facturing a potentially endless number of section 1958 charges
against him and in turn making it possible for him to be
sentenced to consecutive prison terms on each charge. First,
Mandel's sentence does not represent the type of gross sort
of sentence "stacking" that Mandel envisions. Mandel Br. 13.
The district court instead imposed concurrent terms of 120
months on Counts 1 through 3 and 18 months on Counts 5
through 7, with the sentences on the second group of counts
to run consecutively with the sentences on the first, for a
total prison term of 138 months. Furthermore, to the extent
that Mandel's concern implicates the doctrine of sentencing
manipulation, that is a doctrine not recognized in this circuit.
*E.g., United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009). We
do, on the other hand, recognize the doctrine of sentencing
entrapment, but a claim of sentencing entrapment requires
proof that the defendant lacked the predisposition to commit
the offense and "that his will was overcome by 'unrelenting
government persistence.'" *Id.* (quoting *United States v. Gutierrez-
Herrera*, 293 F.3d 373, 377 (7th Cir. 2002)). Mandel could not
make either showing.

August 28, 2008, when Mandel met Dwyer and drove him to another G&D job site and discussed the prospect of having Antoniou killed while in the car and upon arrival at the job site. Count Six was premised on the encounter of November 25, 2008, when Mandel drove Dwyer past Antoniou's home to discuss where and how the murder should be committed. Mandel does not suggest that he was entrapped into using his automobile in connection with the scheme. Nor does he dispute that an automobile, as a "means of transportation," constitutes a facility of interstate commerce for purposes of the federal murder for hire statute. § 1958(b)(2). His contention, rather, is that the intrastate use of a personal automobile falls outside of Congress's Commerce Clause power and thus cannot form the basis for a federal charge.

This argument was not made at any point in the proceedings below. Consequently, our review is for plain error alone. *See United States v. Williams*, 410 F.3d 397, 400 (7th Cir. 2005) (applying plain-error review to forfeited Commerce Clause challenge to defendant's conviction under 18 U.S.C. § 922(g)(1)). We find no plain error in convicting Mandel under section 1958 based on his intrastate use of a private automobile.

The Constitution's Commerce Clause permits Congress to regulate three broad categories of activity: (1) use of the channels of interstate commerce: (2) the instrumentalities of commerce, or persons or things in interstate commerce; and (3) activities that substantially affect commerce. *United States v. Lopez*, *supra*, 514 U.S. at 558-59, 115 S. Ct. at 1629-30. The federal murder for hire

statute is aimed at the second of these categories, and specifically prohibits (as relevant here) use of the instrumentalities of interstate commerce with the intent that a murder be committed for financial or other remuneration. § 1958(a); *United States v. Richeson*, *supra*, 338 F.3d at 659. Facilities of interstate commerce are defined to include means of transportation as well as communication, § 1958(b)(2), and as we have noted, Mandel does not dispute that a car is a means of transportation as the term is defined for purposes of section 1958.

The statute, as Mandel all but concedes, does not require that a facility of interstate commerce actually be used in interstate commerce. This was a point that we settled in *Richeson*. As it was worded at that time, the statute proscribed the use of a "facility *in* interstate commerce" (rather than a "facility *of* interstate or foreign commerce," as the statute now reads) in furtherance of a murder for hire scheme. The defendant contended that his intrastate telephone calls, although employing a facility of interstate commerce as defined by section 1958, was not a use of such a facility *in* interstate or foreign commerce. We rejected the notion that the facility must actually have been employed in interstate commerce in order to bring the defendant's conduct within the reach of the statute:

> We believe there is only one way to reach the plain language of the murder-for-hire statute, and that is to require that the facility, and not its use, be in interstate or foreign commerce. We wholly agree with the Fifth Circuit that § 1958's construction, plain language, context in the realm of commerce clause

jurisprudence, and legislative history all lead to the conclusion that "it is sufficient [under § 1958] that the defendant used an interstate commerce facility in an *intra* state fashion." *Marek*, 238 F.3d at 315. This reading of the statute makes sense from both a logical and legal standpoint; as noted in *Marek*, even the title of the statute, "Use of interstate commerce facilities in the commission of murder-for-hire," shows that Congress intended "interstate commerce" to modify "facility" and not "use." *Id.* 238 F.3d at 321. Moreover, even if the language of § 1958 was ambiguous (we believe it is not), the statute's history indicates that Congress sought to punish contract killings pursuant to its authority to regulate the instrumentalities of interstate commerce, identified in *United States v. Lopez*, 514 U.S. 549, 558, 115 S. Ct. 1624 (1995), as one of three broad categories of conduct appropriately regulated by Congress using its commerce power. . . .

338 F.3d at 660-61 (emphasis in original). *Accord United States v. Nowak*, 370 Fed. Appx. 39, 44-45 (11th Cir.), *cert. denied*, 131 S. Ct. 1910 (2010) (nonprecedential decision) (plain-error review); *United States v. Howard*, 540 F.3d 905, 908 (8th Cir. 2008); *United States v. Means*, 297 Fed. Appx. 755, 758-59 (10th Cir. 2008) (nonprecedential decision); *United States v. Thomas*, 282 Fed. Appx. 244, 246 (4th Cir. 2008) (nonprecedential decision); *United States v. Perez*, 414 F.3d 302, 304-05 (2d Cir. 2005). As the Eleventh Circuit pointed out in *United States v. Drury*, 396 F.3d 1303, 1311 (11th Cir. 2005), when Congress later amended section 1958 in 2004 to substitute the words "facility of"

for "facility in," any doubt on this subject was resolved: "This amendment makes absolutely clear that § 1958 establishes federal jurisdiction whenever any 'facility of interstate commerce' is used in the commission of a murder for hire offense, regardless of whether the use is interstate in nature . . . or purely intrastate in nature . . . ."

As applied to Mandel's intrastate use of his automobile, the statute does not plainly exceed the scope of Congress's Commerce Clause authority. *Lopez* recognizes that Congress may regulate the facilities and instrumentalities of interstate commerce, "even though the threat may come only from intrastate activities." 514 U.S. at 558, 115 S. Ct. at 1629. Thus, as we observed in *Richeson*, "[W]hen Congress elects to regulate under the second prong of *Lopez*, 'federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement.' " 338 F.3d at 660-61 (quoting *Marek*, 238 F.3d at 317). Automobiles are designed to move people and goods over distances both long and short, and as such they play a crucial role in interstate commerce. As the Third Circuit observed in considering the constitutionality of the federal carjacking statute, 18 U.S.C. § 2119:

> Instrumentalities differ from other objects that affect commerce because they are used as a means of transporting goods and people across state lines. Trains and planes are inherently mobile; highways and bridges, though static, are critical to the movement of automobiles. It would be anomalous, therefore, to recognize these categories of instrumentalities

> but to suggest that the similarly mobile auto-
> mobile is not also an instrumentality of interstate
> commerce.

*United States v. Bishop*, 66 F.3d 569, 588 (3d Cir. 1995). *See also United States v. Cobb*, *supra*, 144 F.3d at 322 (Wilkinson, J.) ("The fact that not every car, train, or plane trip has an interstate destination has never been thought to remove these means of transportation from the category of instrumentalities of commerce. Cars, like trains and aircraft, are both inherently mobile and indispensable to the interstate movement of persons and goods.").

Mandel's contrary position, that a private automobile must actually be used in interstate commerce in order for it to come within the scope of the commerce power, is not wholly without support. The Eleventh Circuit, in *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1249-50 (11th Cir. 2008), declined to sustain the Graves Amendment, 49 U.S.C. § 30106, which shields car rental and leasing firms from vicarious liability for injuries to persons or property arising from their customers' use of the lent vehicles, as a valid regulation of instru- mentalities of interstate commerce. The court was con- cerned that if a car's status as an instrumentality of inter- state commerce were by itself sufficient to support the exercise of the commerce power, there would be no limit to the aspects of automobile use that Congress could regulate. "If cars are always instrumentalities of interstate commerce . . . Congress would have plenary power not only over the commercial rental car market, but

over many aspects of automobile use" including "such quintessentially state law matters as traffic rules and licensing drivers." *Id.* at 1250. The court instead upheld the statute on the basis of the third category of activities identified in *Lopez*: activities that substantially affect interstate commerce. *Id.* at 1251-53. For similar reasons, the late Judge Edward R. Becker dissented from the Third Circuit's decision in *Bishop*, noting that whereas rail, plane, and commercial truck traffic is almost always commercial in character, the use of private automobiles is often neither interstate nor commercial; the mere fact that private cars *can* be used in interstate commerce thus was insufficient, in his view, to justify the exercise of the commerce power. 66 F.3d at 598.

But these citations merely demonstrate a difference of opinion as to the reach of federal authority vis-à-vis automobiles, not plain error. Our own decision in *Richeson*, although it resolved a statutory rather than a constitutional argument, supports Mandel's convictions on Counts 1 and 6, and certainly cases such as *Marek* and *Bishop*, which rejected the very constitutional argument that Mandel is making, do so. His conviction cannot be deemed plainly erroneous given the state of the law on this subject. *See United States v. Aslan*, Nos. 08-1486 et al., 2011 WL 1793759, at *20-*21 (7th Cir. May 12, 2011); *United States v. Gibson*, 530 F.3d 606, 612 (7th Cir. 2008); *United States v. Stott*, 245 F.3d 890, 900 (7th Cir. 2001).

### III.

For the foregoing reasons, we AFFIRM Mandel's convictions. We thank Mandel's appointed counsel for his vigorous advocacy on behalf of his client.