**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2060
_____

UNITED STATES OF AMERICA

v.

NARSAN LINGALA,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-19-cr-00110-001)
District Judge: Honorable Freda L. Wolfson
_____

Argued on November 1, 2023

Before: CHAGARES, *Chief Judge*, HARDIMAN, and
MONTGOMERY-REEVES, *Circuit Judges*.


(Filed: January 30, 2024)

Jonathan M. Petty
22 Kirkpatrick Street, P.O. Box 915
New Brunswick, NJ 08903

Stephen Turano [Argued]
100 Riverside Drive, Room 1d
New York, NY 10024

      *Counsel for Defendant-Appellant*

Sabrina G. Comizzoli [Argued]
Mark E. Coyne
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

      *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

A jury convicted Narsan Lingala on four counts related to the attempted murder of his ex-wife. Lingala filed this appeal claiming the District Court made jurisdictional, procedural, constitutional, and evidentiary errors. We will affirm.

# I

## A

In 2012, Lingala and his wife, Saroja Alkanti, divorced after more than 15 years of marriage. The divorce was contentious, and in early 2018, Lingala was arrested for failing to pay alimony and child support. While detained in Middlesex County, Lingala informed his cellmate Carlo Commesso that he wanted Alkanti dead. On his own initiative, Commesso responded by pretending to know someone named "Manny" who could kill Alkanti. Commesso acquired Lingala's New Jersey address so they could keep in touch. A few days later, Commesso contacted Lingala and asked him to send his phone number, which Lingala eventually did. Commesso then began cooperating with law enforcement. To assist them, Commesso introduced Lingala via text message to Carlos Teixeira, a detective and sergeant at the Middlesex County Prosecutor's Office, who was posing as Manny the hitman.

Between June 20 and August 18, 2018, New Jersey authorities recorded 13 phone calls and various texts between Manny and Lingala, some of which were initiated by Lingala. On July 27, Lingala, who was in Indiana at the time, told Manny he was "serious" about the murder-for-hire and asked for a "ballpark idea" on the cost to kill Alkanti. Supp. App. 15–17. In furtherance of the scheme, Lingala drove from Indiana to New Jersey on August 18 to meet Manny to discuss the details.

Lingala's girlfriend, Sandya Reddy, accompanied him to the meeting, which occurred in a mall parking lot. During the meeting, Lingala offered Manny a down payment of $1,000 to kill Alkanti. To help Manny do so, Lingala disclosed

3

Alkanti's name, age, address, phone number, place of employment, and how she got to work. With Reddy's assistance, Lingala also provided Manny with a picture of Alkanti and her residence. Law enforcement arrested Lingala and Reddy at the scene immediately after the meeting.

B

After his arrest, Lingala was charged with murder-for-hire by the State of New Jersey. While detained on those charges, Lingala tried to prevent Reddy from testifying against him at trial. Between October 2018 and January 2019, Lingala repeatedly threatened Reddy in letters urging her not to plead guilty or testify against him. For example, Lingala wrote:

> If you are going to testify against me, then I do not have any choice to defend myself and you will be in <u>very bad shape</u> for the <u>rest of your life</u>!! I will make <u>sure</u> your <u>daughter gets what she deserves</u>. Supp. App. 87 (underlining in original).

> Remember if you damage me, I will not keep quiet. You will also go down with me. Supp. App. 71.

> You are in danger if you take the plea. I will also be forced to use the statements you made, which will put you and your daughter in worst situation [sic]. Supp. App. 82.

> You will not survive a trial against me. Do you understand???? Supp. App. 84.

4

All the letters the Government eventually introduced into evidence at Lingala's trial were either provided to the Government by Reddy's defense counsel or taken from Reddy's cell by the FBI after she was detained for her involvement in the murder-for-hire scheme.[1]

C

Along with the threatening letters he wrote to Reddy, Lingala trained his attention on Sergeant Teixeira. Lingala enlisted fellow inmate Daryl Underwood to bribe Teixeira (or kill him if he did not accept the bribe). Lingala offered to pay Underwood $100,000 to obtain a video recording of Teixeira accepting a bribe. Lingala asked his brother in India for the necessary funds over three-way calls that Underwood's brother helped set up. Lingala's brother subsequently arranged for the delivery of $20,000 to Underwood's brother, $4,000 of which was deposited into Underwood's commissary account. This large deposit drew the attention of jail authorities, who discovered the illicit arrangement by listening to the recorded calls. Underwood pleaded guilty to misprision and agreed to assist with the investigation and testify against Lingala at trial.

D

On February 1, 2019, the United States filed a criminal complaint against Lingala for his role in the murder-for-hire scheme, so New Jersey dismissed its case. During Lingala's transfer to federal custody, FBI agents seized four envelopes in his possession containing almost 1,000 pages of documents. The FBI provided the seized documents to a "taint" team

---

[1] Reddy eventually pleaded guilty in federal court to one count of conspiracy to commit murder-for-hire.

within the United States Attorney's Office to review them and remove any privileged material before turning anything over to the prosecution team.[2] The taint team consisted of one non-lawyer from the FBI and one Assistant United States Attorney (AUSA), neither of whom helped prosecute Lingala. After review by the FBI agent, the AUSA "provided the materials [the agent] designated as non-privileged" to the lawyer who was prosecuting Lingala. Dist. Ct. Dkt. No. 35-1, at 1. The Government admits that the production of documents by the taint team to the prosecution team included at least one potentially privileged document—correspondence "from an unknown attorney relating to an unfamiliar civil litigation." App. 38. Because of that disclosure, the prosecution team returned the documents to the taint team for further review. Following that review, the AUSA released to the prosecution team the documents he designated as non-privileged. The AUSA subsequently produced copies of all seized documents to Lingala.

Lingala moved to suppress evidence of the seized documents, claiming the seizure of his papers violated his rights under the Fourth Amendment to the United States Constitution. Further objecting to the taint team's review of his papers and unilateral determination of any privilege in the documents, Lingala urged the District Court to disqualify the

---

[2] Taint teams consist of people walled-off from the prosecution who screen evidence and remove documents protected by the attorney-client privilege or work-product doctrine to ensure the prosecution team does not view this material. *See United States v. Scarfo*, 41 F.4th 136, 173 (3d Cir. 2022) (citing *In re Search of Elec. Commc'ns in the Account of chakafattah gmail.com at Internet Serv. Provider Google, Inc.*, 802 F.3d 516, 530 (3d Cir. 2015)).

prosecution team from the case because it had benefitted from viewing the documents. The Government responded that it had not used the documents seized from Lingala for any purpose—and would not do so at trial. The District Court denied the motion to suppress and to disqualify the prosecution team.

E

Following the federal criminal complaint charging Lingala with conspiracy to commit murder-for-hire, Lingala was charged in a superseding indictment with conspiracy to commit murder-for-hire (Count One) and murder-for-hire (Count Two), in violation of 18 U.S.C. § 1958 and 2; and witness tampering as to his co-conspirator Reddy (Count Three) and Sergeant Teixeira (Count Four), in violation of 18 U.S.C. § 1512(b).

In an omnibus pretrial motion, Lingala sought both to sever the two witness tampering charges (Counts Three and Four) from the murder-for-hire charges (Counts One and Two) and dismiss the indictment for lack of jurisdiction. Lingala claimed that the witness tampering charges "d[id] not relate physically or temporally with the attempted murder charge" under Rule 8(a) of the Federal Rules of Criminal Procedure and that their joinder was "profoundly prejudicial" under Rule 14(a) because he would be deprived of his right to cross-examine Reddy and testify on the witness tampering charges. App. 78. Lingala also argued that federal agents had improperly manufactured federal jurisdiction to prosecute a primarily local crime, relying on the Second Circuit's decision dismissing an indictment in *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). The District Court denied both motions.

7

To prove Lingala's witness tampering as to Reddy, the Government introduced into evidence letters that Lingala sent to her. Lingala objected that the letters were inadmissible. The District Court rejected each of his arguments.

After seven days of trial, the jury convicted Lingala on all four counts. The District Court sentenced him to 222 months' imprisonment and three years' supervised release. Lingala filed a timely notice of appeal, challenging only his judgment of conviction.

II[3]

Lingala asserts that the District Court should have dismissed the indictment because the Government manufactured federal jurisdiction. We apply a mixed standard of review to the District Court's decision not to dismiss the indictment, so we review its legal conclusions de novo and we review challenges to factual findings for clear error. *United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016).

The applicable statute prohibits traveling interstate or using any "facility of interstate or foreign commerce" with the intent to further a murder-for-hire. 18 U.S.C. § 1958(a). It also defines "facility of interstate or foreign commerce" as "includ[ing] means of transportation and communication." *Id.* § 1958(b)(2). The indictment alleged that Lingala had engaged in interstate travel by driving from Indiana to New Jersey and that he used multiple facilities of interstate commerce: (i) a car; (ii) a cellphone to make calls to Manny, who was in New

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

8

Jersey; and (iii) the internet, along with Reddy, to retrieve photos of Alkanti and information about her. The District Court concluded that Lingala's use of these facilities of interstate commerce and his travel across state lines, as alleged in the indictment, each satisfied the jurisdictional element of the statute.

Lingala counters by citing the Second Circuit's opinion in *Archer*, which prohibits federal officers from "themselves suppl[ying] the interstate element and act[ing] to ensure that an interstate element would be present." *Archer*, 486 F.2d at 682. There are two problems with this argument. First, we have not adopted *Archer*'s concept of "manufactured jurisdiction." *See, e.g.*, *United States v. Faison*, 679 F.2d 292, 293–95 (3d Cir. 1982). Like most of our sister circuits,[4] including the Second Circuit itself,[5] we have emphasized *Archer*'s "limited" holding. *See United States v. Jannotti*, 673 F.2d 578, 610 (3d Cir. 1982) (en banc). Second, even if we had followed *Archer*, its "*statutory* infirmity" was that the phone calls "relied upon to establish jurisdiction . . . were insufficiently related to the criminal activity charged or had been arranged by the federal agents for the *sole purpose* of providing the necessary federal nexus." *Id.* (emphasis added). This is far afield from Lingala's situation. While Lingala was in Indiana, he initiated several calls to Manny in New Jersey, eventually arranging an in-person meeting in New Jersey, which prompted him to drive

---

[4] *See, e.g.*, *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010); *United States v. Mandel*, 647 F.3d 710, 719 (7th Cir. 2011); *United States v. Chi Tong Kuok*, 671 F.3d 931, 938 (9th Cir. 2012).

[5] *See United States v. Gambino*, 566 F.2d 414, 419 (2d Cir. 1977).

9

across state lines. And at the meeting, Lingala used the internet to retrieve information to help Manny kill Alkanti. Unlike the defendants in *Archer*, the Government did not manipulate Lingala into traveling interstate or using various facilities of interstate commerce.

For these reasons, we hold that the District Court did not err in denying Lingala's motion to dismiss the indictment.

## III

Lingala next argues that he is entitled to a new trial on all counts because the District Court violated Rules 8(a) and 14(a) of the Federal Rules of Criminal Procedure when it failed to sever the murder-for-hire counts (Counts One and Two) from the witness tampering counts (Counts Three and Four). We review the Rule 8(a) challenge de novo, and we review the District Court's refusal to sever counts under Rule 14(a) for abuse of discretion. *United States v. Gorecki*, 813 F.2d 40, 41–42 (3d Cir. 1987).

## A

Under Rule 8(a), an indictment "may charge a defendant in separate counts with [two] or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." The witness tampering charges in Counts Three and Four are clearly "connected with" Counts One and Two in "a common scheme or plan," namely, hiring a hitman to kill Alkanti. Many of our sister circuits have embraced a similar approach towards obstruction offenses like witness tampering. *See, e.g.*, *United States v. Stackpole*, 811 F.2d 689, 693 (1st Cir. 1987)

10

(upholding joinder of obstruction of justice counts with arson-related counts); *United States v. Davis*, 752 F.2d 963, 971–72 (5th Cir. 1985) (upholding joinder of obstruction of justice counts with fraud counts); *United States v. Berardi*, 675 F.2d 894, 899–900 (7th Cir. 1982) (upholding joinder of obstruction of justice count with mail fraud and extortion counts); *United States v. Colhoff*, 833 F.3d 980, 983 (8th Cir. 2016) ("Witness tampering is factually interrelated with the proceeding in which the defendant attempted to interfere.") (cleaned up).

Lingala relies on the significant temporal gap between the acts underlying the murder-for-hire counts and the witness tampering counts. But Rule 8(a) does not expressly or impliedly require that offenses be committed within a limited timeframe. Rather, it is a "liberal joinder provision" designed "to promote judicial and prosecutorial economy by the avoidance of multiple trials." *See United States v. Niederberger*, 580 F.2d 63, 66 (3d Cir. 1978). Joinder was thus not improper under Rule 8(a).

B

Lingala fares no better with his Rule 14(a) argument. He cannot meet his "heavy burden" of showing that the joinder produced "clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981). As the District Court noted, the evidence of Lingala's witness tampering would have been admissible at his murder-for-hire trial, and vice versa. *See United States v. Gatto*, 995 F.2d 449, 454 (3d Cir. 1993) ("It is well-established that evidence of threats or intimidation is admissible under Rule 404(b) [of the Federal Rules of Evidence] to show a defendant's consciousness of guilt."); Fed. R. Evid. 404(b)(2) ("[E]vidence [of any other crime,

11

wrong, or act] may be admissible for . . . proving motive."). Lingala argues that the joinder compromised his rights to present a complete defense and testify on his own behalf. But this "bare allegation," without more, is not enough to show a violation of Rule 14(a). *See Gorecki*, 813 F.2d at 43.

\* \* \*

For these reasons, the District Court did not err when it denied Lingala's motion to sever and conduct separate trials for Counts One and Two (related to murder-for-hire) and Counts Three and Four (related to witness tampering).

IV

Lingala also argues he is entitled to a new trial because the District Court should have disqualified the prosecution team. We disagree.

Because the District Court made "a reasoned determination on the basis of a fully prepared record," including written submissions and oral argument, its decision declining to do so was not arbitrary. *United States v. Voigt*, 89 F.3d 1050, 1075 (3d Cir. 1996). We thus review factual findings for clear error and the disqualification decision for abuse of discretion. *United States v. Shah*, 43 F.4th 356, 362 & n.4 (3d Cir. 2022). A district court must "appropriately balance proper considerations of judicial administration against the United States' right to prosecute the matter through counsel of its choice." *United States v. Whittaker*, 268 F.3d 185, 193–94 (3d Cir. 2001). This also requires us "to determine that the [District Court's] discretion was not guided by erroneous legal conclusions," such as its holding that Lingala's motion to

12

suppress was moot. *Koon v. United States*, 518 U.S. 81, 100 (1996).

The District Court based its decision not to disqualify the prosecution team on: (i) the Government's representation that it would not use at trial any documents seized from Lingala; and (ii) its finding that the Government had not relied on the documents in bringing charges against Lingala for witness tampering as to Reddy—which was based on the Court's review of the charging documents against Lingala and Lingala's failure to identify any particular seized document from which the Government benefitted.

A

Lingala claims the District Court "failed to address the issue of whether [he] . . . had a reasonable expectation of privacy in the papers that were seized by the FBI." Lingala Br. 15. But there was no need to do so because the point had become moot once the Government agreed not to use any of the documents taken from Lingala at trial.[6] *Cf. Smith v. Immigr. & Naturalization Serv.*, 585 F.2d 600, 602 (3d Cir. 1978) (per curiam) ("Because the challenged evidence was not in fact introduced, th[e] issue [of whether the defendant was entitled to a hearing on the motion to suppress] is moot."). Our holding here aligns with the reasoning of our sister circuits. *See, e.g.*,

_____

[6] It was not inappropriate for the District Court to accept the Government's representation. As we have recognized, "[p]rosecutors routinely . . . make representations to the court . . . . Whether they do so strategically or for reasons of convenience is of no moment. Once prosecutors undertake such commitments, they are bound to honor them." *United States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010).

13

*United States v. Tiem Trinh*, 665 F.3d 1, 17 (1st Cir. 2011); *United States v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013); *United States v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013); *United States v. Perkins*, 787 F.3d 1329, 1343 n.2 (11th Cir. 2015).

Lingala persists that the District Court abused its discretion by not disqualifying the prosecution team "[b]ecause suppression . . . was not an adequate remedy based on the Government's egregious conduct." Lingala Br. 15. According to Lingala, "[s]imply refraining from using the documents at trial could not cure the illegal search" because the Government could rely on the information gleaned from these documents "whether they used it with a document at trial or not." Lingala Br. 22. For example, Lingala's counsel suggested at oral argument that the documents turned over to the prosecution team contained information laying out Lingala's entrapment defense, allowing the Government to prepare for this argument before the trial. As the Government conceded at oral argument, the taint team made two mistakes: (i) the FBI agent reviewed the documents before the AUSA; and (ii) the taint team did not engage with Lingala's counsel before providing non-privileged materials to the prosecution team. However problematic these missteps may have been, Lingala has not shown "actual taint." *Shah*, 43 F.4th at 363. He has neither identified a single privileged document related to his criminal case that was provided to the prosecution team, nor explained how any of the seized documents could have affected the prosecution team's strategy. As Lingala's counsel admitted at oral argument, any prejudice was "difficult to completely determine." Oral Arg. 3:32–37. Aside from unsupported contentions that the prosecution team must have taken thoughts out of Lingala's head or reviewed notes about defense strategy, Lingala has not

explained how errors made by the taint team deprived him of a fair trial. Lingala's claim that he was prejudiced is nothing more than supposition, which is inadequate to show that the District Court abused its discretion in denying his motion to disqualify the prosecution team.

B

Lingala also asserts that the prosecution team impermissibly relied on the seized documents to secure the indictment against him for witness tampering as to Reddy (Count Three). This argument fails because Lingala cannot show that the District Court's factual findings to the contrary were clearly erroneous. Following a pointed inquiry of the prosecution team and an independent review of the federal criminal complaint against Lingala, the District Court determined that the complaint referenced letters containing information that supported charging Lingala with witness tampering as to Reddy. Because this complaint was filed on February 1, 2019—*before* the search of Lingala's cell and the seizure of his documents—the District Court reasoned that the prosecution team had already acquired information about witness tampering and thus did not rely on any documents seized from Lingala to accuse him of tampering with Reddy.

Lingala responds by emphasizing that he was charged with witness tampering only *after* his documents were seized. But this is not responsive to the District Court's factual findings. As the Court noted, while the criminal complaint did not include a formal charge of witness tampering, it quoted statements made in a letter that Reddy's counsel gave to law enforcement before the seizure of Lingala's documents. Lingala does not contest the source of these statements included in the complaint, and he points to no other evidence

15

supporting a finding that the prosecution team used documents seized from him beyond the chronology of the seizure and the indictment. Lingala thus fails to show that the District Court clearly erred in finding that the prosecution team did not rely on documents seized from him.

\* \* \*

For these reasons, the District Court did not abuse its discretion in refusing to disqualify the prosecution team.

V

Lingala also contends that he should receive a new trial as to the charge of witness tampering with Reddy (Count Three) because the District Court erroneously admitted into evidence letters that support his conviction on this charge. Lingala asserted at trial and now claims on appeal that these letters were inadmissible on four grounds: (i) authentication; (ii) Rule 403 of the Federal Rules of Evidence; (iii) the Confrontation Clause; and (iv) hearsay. We reject each argument.

A

We review the District Court's decision on authenticity for abuse of discretion, *United States v. Browne*, 834 F.3d 403, 408 (3d Cir. 2016), and "the burden of proof for authentication is slight," *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005) (cleaned up). Generally, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

Alkanti testified at trial that letters threatening Reddy were written by Lingala. Her opinion had to be "based on a familiarity with [Lingala's handwriting] that was not acquired" for the criminal case against him. Fed. R. Evid. 901(b)(2). The District Court found this requirement to be satisfied based on Alkanti's 15 years of marriage to Lingala and her testimony that she was familiar with his handwriting. And though Alkanti misidentified a document as having been written by Lingala, the District Court reasonably concluded that this error went to the weight of her testimony, not its admissibility. *See Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 928 (3d Cir. 1986). Lingala remained free to challenge Alkanti's testimony, and his counsel did so during cross-examination and closing arguments. The District Court also instructed the jury that it should give Alkanti's testimony whatever weight it deemed appropriate.

The "distinctive characteristics" of handwritten letters, both their appearance and contents, may also satisfy the authentication requirement. Fed. R. Evid. 901(b)(4). This is particularly so where, as here, the letters are "shown to contain information that persons other than the purported sender are not likely to possess." *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994) (citation omitted). As the District Court observed, several letters signed by Lingala referred to family details and facts of the criminal investigation known only to Lingala, Reddy, and law enforcement.

In light of the slight burden of proof for authentication, we hold the District Court did not abuse its discretion when it found that the handwritten letters were properly authenticated based on Alkanti's identification and the distinctive characteristics of the letters.

17

## B

We review the District Court's decision to admit the letters over a Rule 403 challenge for abuse of discretion and construe its discretion "especially broadly." *United States v. Scarfo*, 41 F.4th 136, 178 n.35 (3d Cir. 2022). And even "[i]f the record fails to include an explicit Rule 403 analysis," we may "decide the trial court implicitly performed the required balance[] or . . . perform the balance oursel[ves]." *United States v. Heinrich*, 971 F.3d 160, 163 (3d Cir. 2020) (cleaned up).

Rule 403 permits a court to exclude "relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice," that is, prejudice "suggest[ing] a decision on an improper basis," not the persuasive weight of the evidence. *United States v. Rutland*, 372 F.3d 543, 545–46 (3d Cir. 2004) (cleaned up). The letters were highly probative—and not only to the charge of witness tampering with Reddy. One letter provided evidence of Lingala's intent to prevent Teixeira's testimony, and the letters suggested Lingala's consciousness of guilt as to the murder-for-hire charges. *See, e.g.*, *Gatto*, 995 F.2d at 454. To support his Rule 403 challenge at trial, Lingala argued that the Government's failure to call Reddy as a witness would cause the jury to infer incorrectly that Reddy was too intimidated to testify—or perhaps even physically incapacitated by Lingala. To address this concern, the District Court secured assurances from the Government that it would not suggest the letters had affected Reddy in any way, thereby reducing any danger of unfair prejudice. Implicitly weighing this minimal risk of unfair prejudice against the significant probative value of the letters, the District Court found that neither the letters nor the Government's decision not to call Reddy to testify violated Rule 403.

Lingala now argues for the first time on appeal that the District Court abused its discretion by failing to analyze the letters under specific factors for Rule 403 balancing applicable to so-called "threat evidence" that we laid out in *United States v. Guerrero*: (i) the "need for the evidence," based on "the importance and centrality to the ultimate issue in the case" and "the availability of other evidence"; (ii) "the prejudicial nature of the threat evidence," which includes "the tendency of the particular conduct alleged to suggest decision on an improper basis," "the nature or style of the . . . narrative," "the likelihood that the testimony is true," and "the sufficiency of the other evidence presented"; and (iii) "the extent to which any possible inflaming of the jury can be cured by limiting instructions." 803 F.2d 783, 785–86 (3d Cir. 1986) (cleaned up).

Because the failure to make an argument results in forfeiture, we consider whether the Rule 403 argument that Lingala advanced at trial is the same as the one he now raises. *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004). While Lingala's trial argument at most implicated only Rule 403's general balancing test in weighing the probative value of evidence against its potential prejudicial effect, *Guerrero*, 803 F.2d at 785, his appellate argument urges consideration of specific factors, none of which Lingala identified in the District Court. While "[p]arties are free . . . to place greater emphasis and more fully explain an argument on appeal than they did in the District Court," "[r]evisions at some point become differences in kind, presenting a completely new argument altogether." *United States v. Joseph*, 730 F.3d 336, 341 & n.5 (3d Cir. 2013). If two arguments rely on distinct legal rules or standards, "they are not the same[,] and the raising of one will not preserve the other." *Id.* at 342. We thus deem his *Guerrero*

19

argument forfeited and review it only for plain error. *See United States v. Henderson*, 64 F.4th 111, 116 (3d Cir. 2023).

To prevail under plain-error review, Lingala must show (i) an error; (ii) that was plain; (iii) that prejudiced him; and (iv) that "if uncorrected, would seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Payano*, 930 F.3d 186, 191–92 (3d Cir. 2019) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). Even if the District Court erred in not considering the *Guerrero* factors, Lingala cannot make a showing of prejudice—in other words, that the District Court's failure to apply *Guerrero* resulted in the admission of the letters in violation of Rule 403 and that admitting them had a reasonable probability of affecting the outcome of the proceedings. *Payano*, 930 F.3d at 192. Unlike Guerrero, Lingala was on trial for witness tampering. *See Guerrero*, 803 F.2d at 784. The letters sent to Reddy were thus central to the charges against Lingala, and nothing suggests that other, similarly probative evidence was available.

Even on appeal, Lingala does not explain how the letters—or the Government's decision not to call Reddy as a witness—were unfairly prejudicial. No doubt, Lingala's letters harmed his case. But neither their content nor style suggested that the jury would be inflamed or otherwise decide his fate on an "improper basis," *see id.* at 786, especially in light of the Government's representation that it would not discuss any impact the letters may have had on Reddy as well as the District Court's instruction that the jury not speculate about the absence of any individuals not named as defendants in the indictment, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (presuming that jurors follow limiting instructions). So even had the District Court applied the *Guerrero* factors, it would have admitted the letters into evidence.

20

## C

Lingala makes two additional evidentiary challenges based on the Confrontation Clause and hearsay. These arguments both fail because the letters contained Lingala's own statements. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (citing *Crawford v. Washington*, 541 U.S. 36, 51 (2004)); Fed. R. Evid. 801(d)(2)(A).

\* \* \*

For the reasons stated, we reject Lingala's evidentiary arguments.

## VI

The District Court had jurisdiction over Lingala's case, and he was convicted by a jury after a fair trial. Because none of his claims of error is persuasive, we will affirm the judgment of conviction.